## MILLIKEN v. DEHON, Executrix.

Upon the consignment for sale of cotton in store with third parties at New York city, the consignee made an advance of 11¼ cents for each pound, to be repaid at a day certain, under an agreement that, should there be a decline in the market price of cotton, the consignor should, on demand, deposit cash sufficient to cover such decline, and if he failed to do so, or to repay the advance at a fixed day, the consignee might sell the cotton

Milliken *v.* Dehon.

at public or private sale, or otherwise, at his option, for the most it would bring. This, if a pledge at all in a legal sense, was a peculiar contract, including more than a pledge, and to be construed upon its own language and circumstances.

The consignor having failed to make good a decline in the market price of cotton, the consignee was at liberty to sell in the mode usual in the New York market, without giving notice of his intention or of the time or place of sale.

The consignee is bound to give notice of a decline and make an actual demand for the margin: such demand need not be personal, but may be made of the consignor's clerk, employed by him as his agent in the particular transaction.

APPEAL from an order of the Superior Court of the city of New York, granting a new trial, with stipulation for final judgment. Action against Theodore Dehon (who, pending the suit, died), to recover damages for an alleged wrongful conversion of 130 bales of cotton. About the 7th of November, 1860, the plaintiff, who was the owner of 130 bales of cotton, stored with Briever & Caldwell, and the New York Warehousing Company, consigned the same to Dehon for sale, and on such consignment the latter advanced to the plaintiff $7,000, on his note, at sixty days from date, with the agreement that on the 4th January, 1861, the plaintiff would pay to Dehon in cash, less five days' interest, the $7,000, with one per cent commission for the loan of the advance; and in default of so doing, Dehon might sell the cotton, at public or private sale, or otherwise, at his option, for the most that it would bring. The same right was to be exercised by Dehon, should a decline occur in the market value of the cotton, and the plaintiff fail, whenever demanded, to deposit in cash, sufficient to cover such decline; so that, at all times, Dehon should have a margin of one and one-fourth cents per pound in his hands. If the property was sold by reason of default, an additional commission of one and one-half per cent was to be allowed Dehon, also the customary charges incident thereto; and should a surplus result, over and above Dehon's advances and charges, he was to pay the same over to the plaintiff; and if a deficit, the plaintiff was to pay the same to Dehon in cash, on receiving a statement of account.

The weight of the cotton was 61,990 pounds; so that the advance of $7,000, was 11⅜ cents per pound, and a margin of 1¼ cents would increase that to nearly 12½ cents per pound. There having been a decline in the market value of the cotton, on the 16th December, Dehon employed a cotton broker to sell the cotton, and it was sold on the 26th December, for 11¼ cents per pound, being the highest market price at that time, and more than could have been obtained for it for ten days previously. It was sold by sample, not at public sale, but in the ordinary way that the article is sold in the New York market. There was no proof that the plaintiff had any notice of the time or place of sale.

The evidence was conflicting, whether before this sale Dehon gave notice to the plaintiff that the price of cotton had declined below the margin stipulated in the contract, and demanded of him that he should make the margin good. On the part of the plaintiff, James Douglass, who was employed by the plaintiff as a clerk, and who sometimes did out-door business, and who, in fact, negotiated the loan on the cotton, testified that the plaintiff at no time, through him, or otherwise, had been notified of the decline, and required to keep good the margin. On the part of the defendant three witnesses gave testimony which, if credited, tended to show, conclusively, that the plaintiff had been notified of the decline in the market value of the cotton; that Dehon had demanded, between the latter part of November and middle of December, that the margin should be made good, claiming that the cotton had fallen below the margin; that Douglass admitted the decline, stated that the plaintiff could pay no additional margin, and wanted him to abstain from selling, if possible; that Dehon refused, saying to him that the plaintiff must make the margin good, if he wanted him to hold on to the goods; that he must make the margin good the next day, and if he did not he would sell. The court submitted the question to the jury, whether Dehon did demand of the plaintiff that the margin should be made good by him, and whether the price of cotton had fallen, at the time, below the amount specified in

the contract, and the jury found on these issues against the plaintiff.

On the 5th January, 1861, the plaintiff offered to Dehon a certified check for the amount of the advances and charges on the cotton, and demanded from him the 130 bales. Dehon refused to accept the check, alleging that he could not deliver the cotton, as he had sold it. The market price of this cotton on the 5th January, at the time of the demand, was 12¾ cents per pound, and its highest market price prior to the trial in February, 1862, was 38 cents per pound. This was about the middle of December, 1860.

The court charged the jury, that if they found that before the sale of the cotton by Dehon, the margin was deficient, and that a demand was made by Mr. Dehon on Mr. Douglass to make the margin good, and that Mr. Douglass was at the time the agent of the plaintiff, and that the demand was not complied with by Mr. Milliken, then their verdict should be for the defendant. To this the plaintiff excepted. But if they found that Mr. Dehon, without giving such notice, sold the cotton, he sold it in violation of the rights of Mr. Milliken, and on the 4th January Mr. Milliken had a right to tender the amount of the loan, and to demand the delivery of the cotton to him; and he was entitled to recover.

The plaintiff's counsel asked the judge to charge the following propositions:

1. That Mr. Dehon had no right to sell the pledged property until he had caused a demand of payment of the margin to be made, personally, of the plaintiff.

2. That in order to have authorized a sale of the cotton which was the subject of the pledge, by the pledgee, without judicial proceedings, notice to redeem should have been given to the plaintiff.

3. Notice of the sale should also have been given to the plaintiff.

4. Notice of the time, place and manner of the sale should also have been given to the plaintiff.

5. That such notices should have been personal to the plaintiff.

The judge declined to charge the propositions, and to the refusal the plaintiff excepted.

The jury found a verdict for the defendant. The exceptions were directed to be heard, in the first instance, at general term, on a case to be made.

The court, at general term, set aside the verdict and granted a new trial; and from this order the defendant appealed to this court, stipulating that, if such order be affirmed, judgment absolute should be rendered against said defendant.

*D. B. Eaton,* for the appellant.

*E. W. Stoughton,* for the respondent.

WRIGHT, J. This seems to be a plain case. In the early part of November, 1860, the plaintiff, who was the owner of 130 bales of cotton, applied to the defendant's testator for a loan or advance thereon of $7,000, which, as the plaintiff estimated the weight of the cotton, was equal to $10\frac{3}{8}$ cents per pound, and according to its actual weight, $11\frac{1}{4}$ cents per pound. The advance was made upon conditions specially agreed on, and without which it is reasonable to assume it would not have been made. The plaintiff was to consign or pledge to Dehon the cotton, which was an article of fluctuating value in the market, the plaintiff agreeing to repay the advance on the 4th January following. Special authority was given to Dehon to sell the cotton "at public or private sale, or otherwise, at his option, for the most that it would bring," in two contingencies: 1st. If a decline should occur in the market value, and the plaintiff failed, whenever demanded, to deposit, in cash, sufficient to cover such decline, so that Dehon should at all times have in his hands a margin of $1\frac{1}{4}$ cents per pound; and 2d. If the plaintiff should make default in the payment of the advance, in cash, on the 4th January, 1861, less five days' interest, with one per cent commission. This was something more than a mere pledge, where

the pledgor would be entitled to notice to redeem, and also notice of the time and place that the pledged article would be publicly exposed to sale. Indeed, it is doubtful whether, in a legal sense, a pledge of the cotton was made at all, or that, strictly, the relation of pledgor and pledgee was created. A pledge is defined to be " delivery of goods by a debtor to his creditor, to be kept till the debt be discharged." (Jones' Bail., 117; 2 Kent's Com., 577.) Here there was a constructive delivery of the cotton before any relation of debtor or creditor existed, and not by way of bailment, but as a consignment. It was a peculiar contract between the parties, and is to be construed according to its own language and circumstances; and I apprehend that any apparent difficulty grows out of a perversion of it by a nice adhesion to rules at best only applicable to relations of strict and simple pledgor and pledgee.

It was certainly competent for the plaintiff to contract (with the view of fully securing the advance) that Dehon should hold the cotton, and if its value declined in market, he would deposit a sum in cash equal to such decline, so that the consignee or pledgee would at all times have in his hands a margin of $1\frac{1}{4}$ cents per pound; that is, a cash deposit which would increase the value of the cotton $1\frac{1}{4}$ cents per pound beyond the current market price; and it was equally competent for the plaintiff to agree that, failing to do so, whenever demanded, Dehon should have the right to dispose of the cotton "at public or private sale, or otherwise, at his option, for the most that it would bring." The plaintiff cannot legally insist that he should have notice of the time and place of sale, that he had expressly agreed might be public or private, or otherwise, as the consignee or pledgee should determine. In case of a simple pledge with a mere right of sale, the sale must be public, and notice given of the time and place. But here the right of sale is enlarged by expressly yielding the privilege of claiming a public sale, and authorizing the party to sell at private sale. The private sale spoken of in the contract, and which was within the intention of the parties, was clearly a private sale, to be made in the ordinary way, without notice

of time or place, and known and made public to the parties thereto alone. Under the clause allowing a sale for a fall below the margin agreed to be kept up, no prompt sale, adequate to protect the pledgee from loss, and such as was evidently contemplated, could be made, if it was necessary to serve a notice of time and place of sale on the plaintiff. The whole proceeding would be ridiculous and impracticable. It is impossible to raise from the language of this contract, as the Court below attempted to do, an implied obligation to give notice to the plaintiff of the time and place where the cotton would be sold for his default. The parties did not intend it; and, ordinarily, it would be impracticable to affect a private sale of a lot of cotton, in the way such sales are usually made, if such notice was required to be given.

With this view of the law, the only question in the case was one of fact, viz., whether the plaintiff had made default in keeping up the margin, at the time of the sale of the cotton by Dehon. If he had, then Dehon was justified in selling. If he had not, the sale was wrongful. Two things must have concurred to put the plaintiff in default—a decline in the market value of cotton below the margin stipulated in the contract, and a demand, by Dehon, that the plaintiff should make such margin good. The jury were substantially so instructed by the judge at the trial; and the findings of the jury upon these questions of fact were, in effect, against the plaintiff. After a charge, in which they were distinctly instructed that, before Dehon could sell the cotton, the price must have fallen below the amount specified in the contract, and he must also have demanded of the plaintiff that the margin should be made good by him, they found for the defendant.

The judge was requested to instruct the jury that Dehon had no right to sell the pledged property, until he had first caused a demand of payment of the margin, to be made personally of the plaintiff. If by this was meant that there should be an actual, instead of a constructive, demand and notice, the request was unobjectionable. But this was not the meaning. The loan had been negotiated through one Doug-

Milliken *v.* Dehon.

lass, a clerk of the plaintiff, who sometimes did out-door business for him; and the proof tended conclusively to show that he acted as the plaintiff's agent in the particular transaction. Douglass had several interviews with Dehon in the month of December, while samples were in the hands of the cotton broker, in relation to the threatened sale of the cotton. He knew of the decline, and that the margin was deficient, and in these interviews, urged that the sale should be delayed. He was told, that if the plaintiff did not pay the margin within a day or two, the cotton would be sold; that Dehon had already borne with the plaintiff for some time, and could not longer take the risk; and when requesting delay, represented that it was inconvenient, or indeed quite impossible, for the plaintiff to pay up his margins. This evidence showed that the demand was made to Douglass, and not to the plaintiff in person. Accordingly, the judge charged the jury that if they found that a demand was made on Douglass to make the margin good, it would be necessary to determine whether Douglass was authorized by the plaintiff to receive a notice of that kind, and that would depend entirely upon the question whether Douglass was the agent of the plaintiff or not. If Douglass was the agent of the plaintiff in the transaction of the business, and notice was given to him requiring that the margin should be made good within one or two days, as testified to by some of the witnesses, then such notice was sufficient to the plaintiff. It was to the proposition in the charge, that demand and notice to the agent transacting the business was sufficient notice to the principal, that the plaintiff's counsel took exception, insisting that to authorize a sale, the demand should have been made personally on the plaintiff. But, clearly, this was unnecessary to put the latter in default, if Douglass was authorized to receive the notice for him. The evidence tended to the conclusion that he had such authority.

Questions were put to the plaintiff, as a witness, with the view of showing that no demand had been made on him personally, and excluded. This exclusion had no important bearing on the rights of the parties. It was not pretended

that any demand had ever been made upon the plaintiff, individually; and if the law required such a demand, it was conceded that the sale was without authority. It was quite unnecessary that the plaintiff should testify to the fact, to enable his counsel to raise the question of law. I think no error was committed at the circuit, and that the order for a new trial should be reversed, and judgment rendered on the verdict for the defendant.

MARVIN, J. It is very properly conceded, in the opinion of the general term, that any or all of the pawnor's rights can be waived or modified by consent, including notice of time and place of sale. But it is said that there is no express waiver of such notice in this case, and that none should be implied.

Let us turn to the contract between the parties. Should a decline occur in the market value of said merchandise, and I fail, whenever demanded, to deposit in cash sufficient to cover such decline, &c., then "the right is hereby given you to sell this merchandise at public or private sale, or otherwise, at your option, for the most it will bring." The merchandise was cotton. It was stored in two warehouses in New York. The mode of selling cotton in New York is by sample, exhibited by a broker, employed for such purpose. The usual course was adopted in this case, and the plaintiff, by his agent, knew that the samples were with the broker. He knew that the defendant intended to sell the cotton, unless the margin was made good, and he wanted the defendant to abstain from selling, if possible, and the defendant refused, unless the margin should be made good the next day, the witness thinks, or he would sell. This was some days before the sale. The cotton was on sale for more than two weeks, and the plaintiff, by his agent, knew the fact, and at one time expressed the hope to the brokers that they would not sell it, but hold it a few days longer, and use their influence with Dehon. It was proved that the cotton was sold in the usual way; that there was no other way of selling cotton, except

Milliken *v.* Dehon.

by samples. Can it be said, in the light of these facts, that it was necessary that notice of the precise time and place where the sale would be made should be given? This is the position assumed, and it must be fully sustained to justify a new trial. All contracts should receive a fair and reasonable construction, having regard to the subject matter of the contract.

The general rule, in the absence of a contract affecting the question, is, that the pledgor must have notice of the time and the place of sale; and the principal reason assigned for the rule is, that he may have an opportunity to attend the sale, and see that it is fairly conducted: that he may exert himself in procuring buyers, and thus enhance the price; that he has, in fact, the right to redeem the pledge at any moment before the sale shall be actually made. These rules should be carefully adhered to, in all cases in which they are applicable. They may be modified or waived by agreement; and in case a special agreement has been made between the parties, controlling their rights, it is subjected, like other agreements, to the well-settled rules of construction. In the present case, the agreement was, upon the happening of a specified contingency, that the pledgee should have the right to sell the pledge, at public or private sale or otherwise, at his option, for the most it would bring. The pledge was cotton, in certain warehouses in the city of New York. Cotton, under such circumstances, is usually sold by brokers, employed for such purposes, and always, or at any rate usually, by samples. The broker offers the cotton for sale, and those persons who desire to purchase examine the samples and make offers, or a price is proposed by one of the parties, and it is accepted or declined, as the case may be; and this course is proceeded in until a sale is effected. It may be said that the sale is private; and yet it may have partaken largely of a public character, the samples having been exhibited to many persons, for days in succession, attended by negotiations for sale and purchase, as in the present case. The cotton being on sale, and the broker, being instructed to sell "for the most it will bring," is ready to close the bargain whenever the largest price the cotton will bring is offered. He may

have such offer at any moment, or it may be days before a satisfactory offer is made. How is it practicable to give notice to the pledgor of the time and place of sale? Any offer made. may be withdrawn, unless accepted at once, and thus a desirable sale may be lost. It is not denied that the defendant had the right to make a private sale; but this, it is said, did not give him the right to sell without notice to the pledgor of the time and place; and I concede that notice may be necessary in some cases where the authority is to sell at private sale, as will be noticed hereafter. But was such notice required in this case? Did the parties to the agreement contemplate such notice? I think not. They knew the course of trade, the mode of selling cotton; and they contracted in reference to such mode. They knew that brokers were employed; that they made sales by sample; and that such samples were exhibited, sometimes for days and weeks, until a sale should be effected. The parties contemplated a fair sale, in the well understood mode of making such sales, and must have seen that a notice of the time and place of sale would be extremely inconvenient, if not impracticable; and, in my opinion, neither of the parties to the contract contemplated any such notice. The contract goes further. It authorizes a public sale, or a sale otherwise. But it is not necessary to remark upon the powers thus conferred, as the sale was fairly made in the only usual way.

If we again refer to the reasons of the rule requiring notice of the time and place of sale, it will be seen that all the reasons were, in this case, fully satisfied. The cotton was "on sale" two or three weeks; the plaintiff, by his agent, knew the facts, had interviews with the brokers offering the cotton for sale, and had full and ample opportunity to procure friends, or persons dealing in cotton, to go and examine the samples, and purchase the cotton at the highest price; and, for aught we know, may have exerted himself to this end. It seems to me that he had all the notice which the reasons of the rule can require. There is no complaint of any secrecy or unfairness in the sale.

Let us examine the cases cited by the plaintiff's counsel. In *Stearns* v. *Marsh* (4 Den., 227), there was no special agreement affecting the questions decided. There was no demand of the debt when due, nor was there any notice of the sale, except a notice of a sale of a large and general assortment of boots and shoes, by the autioneer, published in a daily paper. The boots and shoes, worth $520.32, were sold at the auction for $166.97. The notice was published in the paper before the debt was due. It was held that the debt should have been demanded, and if not paid, personal notice of the time and place of sale should have been given.

In *Wilson* v. *Little* (2 Comst., 443), railroad stock was pledged to secure the payment of a note presently due, with authority to sell the stock at the broker's board, or at public auction or at private sale, at option, on the non-performance of the promise, without notice. The defendant sold the stock without demanding the debt or giving notice of the sale. It was held that he was bound to demand the debt before resorting to the sale. In the opinion it is said: "In every contract of pledge there is a right of redemption on the part of the debtor; but in this case that right was illusory and of no value if the creditor could instantly, without demand of payment and without notice, sell the thing pledged. We are not required to give the transaction so unreasonable a construction. The borrower agreed that the lender might sell without notice, but not that he might sell without demand of payment, which is a different thing."

In *Wheeler* v. *Newbold* (16 N. Y., 393), promissory notes were pledged, and it was held, in the absence of a special authority, that the pledgee had no right to sell this commercial paper, even after demand of payment of the debt and notice of the sale, but that he was bound to hold and collect them, and apply the proceeds.

In *Allen* v. *Dykers* (3 Hill, 593; *S. C.,* 7 Hill, 497), the promise was to pay money sixty days after date, and stocks were pledged as collateral security, with authority to sell on the non-performance of the promise; the sale to be made at the

board of brokers; notice waived, if not paid at maturity. The stock was sold by the pledgees before the loan became due, and I infer, though it does not so expressly appear, that the sale was private and secret. The Reporter's syllabus of what Chancellor WALWORTH said as to the power to sell, is that "the contract did not give the right to sell the stock secretly at the board of brokers, in any event, but he was bound to put it up openly, and offer it to the highest bidder, stating that it was pledged to secure the note, with authority to sell." I have no objections to the remarks of the Chancellor, as indicating what should be done under such a power, in order to release a sale from any suspicion of unfairness or collusion. He cites no authority, and the remarks were quite unnecessary in the case, though, I think, well enough, under the general rule that the sale must be fair and open. They have no application to the present case, unless it be as an illustration of the construction put upon a power to sell at the board of brokers.

*Wilson* v. *Little*, 1 Sandf., 351, is the same case in 2 Comst. (*supra*). There is nothing in these cases in conflict with the view I have taken of the contract in this case. Considering the property, and the manner of selling such property, in connection with the authority to sell at private sale, or otherwise, in my opinion, a fair construction of the contract will exclude the necessity of giving notice of the precise time and place of sale.

It is also insisted that the defendant was bound to make a demand of payment of the margin personally of the pledgor; and that notice to redeem should have been given personally; and so as to the time and place of sale. No demand of the money loaned was made upon the borrower or his agent; and, in my opinion, this was not necessary in this case. The general rule is, that a demand of the debt must be made after it is due, before the pledgee can resort to his remedy by sale. In this case the money loaned was not due, and the parties had expressly agreed that, in case the stipulated margin should not be kept good "whenever demanded," then the authority to sell should arise. The demand to make the margin good

Milliken *v.* Dehon.

was made, and this was all the demand that the pledgee had at the time, a right to make. This demand was made upon Douglass, who as the jury have found, was the agent of Milliken in the transaction of the business, authorized to receive a notice of the kind. In my opinion this was a sufficent demand upon the general law of agency. If Douglass was the agent of Milliken in the transaction of the business, a demand made upon him was equivalent to a demand upon Milliken; and so, I think, as to a notice of sale in case any notice was necessary. I am aware that some of the judges speak of personal demands and notices. Thus, Judge BROWN, in *Wheeler* v. *Newbold* (16 N. Y., 399), speaks of the duty of the pledgee to give personal notice of the time and place of sale, citing 2 Story Eq., § 1008, where Story says, the pledgee may sell, "without any judicial sanction, after giving the proper notice of the intended sale, as prescribed by law to the debtor." Chancellor KENT says, reasonable notice to the debtor to redeem (2 Comm., 583); and so says Parsons on Contracts (p. 601), as to notice of sale. It seems to me that a demand upon an authorized agent, or notice given to him is, in law, equivalent to a notice to the principal; and no reasons occur to me why such demand or notice should not bind the principal. It is not a proceeding by which a personal judgment is to be recovered. A different rule would often be very inconvenient.

There are some other exceptions, none of which were, in my opinion, well taken, and I think the case was properly tried, and that the defendant was entitled to judgment upon the verdict. The order granting a new trial should be reversed.

DENIO, Ch. J., and ROSEKRANS, J., took no part in the decision; all the other judges concurring,

> Order reversed, and judgment absolute
> for defendant.