C. Clothier Jones and Others, Doing Business as C. Clothier Jones & Company, Plaintiffs, *v.* Frank S. De Ronde, Defendant.

Supreme Court, New York County, February 24, 1932.

*Mack, Taylor, Spiegelberg & McCauley*, for the plaintiffs.

*Stephen K. Rapp*, for the defendant.

BLACK, J.   Plaintiffs in this case, who are members of the New York Stock Exchange, sued defendant for $17,951.44, balance on a customer's account, and also claimed that there was an " account stated " as between the plaintiffs and the defendant by reason of the fact that an account had been mailed defendant, which he had accepted and retained without objection.   Upon this account at the bottom were the words: " It is agreed that all securities purchased or sold on margin or deposited in this account may be pledged by us with other securities or *otherwise used* in accordance with the customs of members of New York or Philadelphia Stock Exchanges, and that on default as to margin, we may buy or sell said securities without notice of time and place of sale.   Please examine this statement at once, reporting promptly any discrepancy that may appear therein.   If a report is not received within ten days, the account will be considered correct."   Plaintiffs also sought to sustain their contention by a printed agreement signed by the customer which will be referred to later.   This agreement was headed in big type " customer's signature card."   The body of the agreement is in nonpareil type.   A copy of it is attached at the end hereof.

Defendant denies that anything is due plaintiffs and claims that he repeatedly protested to plaintiffs as to the correctness and accuracy of the statements that plaintiffs had sent him, and denied

plaintiffs' authority to make some of the trades the account showed. The " customer's signature card " offered in evidence was signed by the defendant, who is being sued for the balance, and " accepted by " the plaintiffs by three letters written in lead pencil on the left side at the bottom. This " customer's signature card," within its printed dimensions of eight by five inches (from which must be deducted the one and seven-eighths inches by one inch for margin and signatures) contained 455 words, and it will be observed that after the reassuring expression that " stocks and securities are pledged to the broker as collateral security " it provides " *that such stocks, securities and commodities may be loaned by the brokers* " (this means that stocks bought by the signer of the card could be loaned by the broker for " short sale " deliveries in which the plaintiffs had no interest, but which could have only the effect of " bearing " the stocks covered by plaintiffs' purchases), " *or may be pledged, either separately or with other securities, for any amount, and commodities carried by the broker for the customer's account, or supplied by them against sales by the customer, may be sold or purchased at brokers board, or at public and private sale, without notice of such sale or purchase deemed necessary* " (presumably in the opinion of the broker) " *for the broker's protection; that brokers may in said purchases or sales act as principal if they so desire; that in the event of such sales or purchases being insufficient to liquidate the account, the customer agrees to pay the balance due upon demand.*" It will be observed that in the first paragraph of this " customer's signature card " the customer says: " *I desire to arrange with you to act as brokers* for me," and that the expression in the second paragraph above quoted is that the brokers may in said purchases or sales act *as principal* if they so desire. We thus find that in the same contract the customer states his desire that the plaintiffs (the brokerage firm) act as his broker and that the brokers exact the agreement that they may act as " principals, if they so desire." This may mean that the broker may act as principal in dealing with outsiders, but by no flight of legal fancy could they act as principals to their customer who had in the first line of the agreement expressed his desire that the brokerage firm should act as his " broker."

It is difficult to conceive of a more one-sided agreement or one more unfair. To hold that it bound defendant would be to assume that the defendant understood all the whole technical and intricate workings of the Stock Exchange and its Stock Clearing Corporation, and all the customs of the exchange or market where the transactions are executed, and the court would also have to assume that the defendant (the customer) knew all the amendments to the rules or

by-laws governing the New York Stock Exchange and its clearing house. The constitution of the New York Stock Exchange comprises forty-nine pages in " The Law of Stock Brokers and Stock Exchanges " (Meyer), containing twenty-six articles and one hundred and twenty-four sections, some of which sections have twenty subdivisions. The Rules of the Stock Exchange cover thirty-four pages, twenty-two chapters, one hundred and twenty-five sections, and twenty subdivisions. Stock Exchange Rules Relating to the Delivery of Securities cover ten pages, with two-hundred and sixty-four sections. By-laws of the Stock Clearing Corporation consist of thirteen articles, thirty-nine sections and eleven subdivisions, covering twelve pages. Rules of the Stock Clearing Corporation cover forty-one pages, with forty-one rules and thirty-five subdivisions. Of course, most of these voluminous provisions do not apply to the present case.

The defendant testified that he was not very familiar with the transactions between the broker and his customer, although this was denied by plaintiffs. If the court should give the effect to the contentions which plaintiffs' attorneys contended for, it would mean that if a customer agreed to be bound by a statement of account by a broker, and did not object within ten days, he could not afterwards be heard to say what the truth was about the account, even though, as occurred in this case, there were errors which the plaintiff itself, subsequent to the rendition of the first accounts, discovered and corrected, and if this court should hold that the broker had the unlimited and all-embracing powers covered by the contract contained in the customer's signature card, the broker would have the right to lend stocks (bought by the customer for a rise) to himself or others for the purpose of making deliveries under so-called " short sales." The effect of such a ruling would be that a broker holding such a monstrous contract as that contained in the " customer's signature card " could take the very stocks the customer had bought with the expectation and hope of a rise and deliver them to another customer of their own or of some other broker, so that such other customer of their own or of another broker could under the rules of the exchange use these very shares to hammer down the price not only of those shares themselves, but of the entire list of shares dealt with on the exchange, because holders of the same shares as those bought by the customer must protect their accounts when called for margins by cash deposits realized from the sale of any other shares they may own. No one who has the least knowledge of the market would ever believe that a customer who signed a " customer's signature card " ever had any such intention. If the intention of the plain-

tiffs had been to apprise the customer of the effect of what he was signing, they could have specially set out in the " customer's signature card," signed by the customer, that the broker was authorized to use the stocks which he had purchased for defendant to make deliveries under short sales. This was done in the contract in the case of *Klapp* v. *Bache* (229 App. Div. 415). There the broker only had the right under his contract to use the customer's stocks in this manner if there was a failure on the part of the customer to comply with the provisions in the agreement in the " customer's signature card." In the present case there is no such limitation. It would serve no useful purpose to characterize this vicious " customer's signature card." It can be compared to nothing except a commercial " dead fall." The only comparison that suggests itself to this contract on the ". customer's signature card " is to say that it is in the nature of a self-starting financial guillotine prepared by the plaintiffs for the customer. Of course it is conceivable that a plaintiff might never take advantage of such drastic and unconscionable provisions, but the potential effects of this " customer's signature card " are beyond calculation in the damage that might be done the customer who signed it if the broker saw fit to invoke it and the courts should enforce it. It is totally one-sided for the benefit of the broker. It lacks consideration, because for this entire parting with his rights the customer secures no correlative advantage. It seeks in its close fine print to entirely repeal the law of the State of New York first set forth in the case of *Markham* v. *Jaudon* (41 N. Y. 235), where it was clearly held that the relation of the customer and the broker is that of pledgor and pledgee, and that the broker, from the time the order is given, is acting for the customer, and that he has no right to sell out a customer without reasonable notice that further margins are necessary, so that the customer may have the right to furnish them in order to protect his trades. For his work for a customer the broker is paid a commission, and upon the difference he advances between the margins put up by the customer and the value of the stock, he is paid interest, presumably no lower interest than he pays for the money borrowed for the customer's benefit. He has no right whatever, especially in the absence of any failure on the part of the customer to carry out his agreements, to lend stocks bought for a rise in the market to other accounts or to other brokers for the purpose of making deliveries under short sales where the only tendency can be, at least temporarily, to depress the market and to that extent destroy the value of the customer's stock which he has innocently bought for a rise in the market.

There is no evidence that this agreement was dictated or has

been approved by the New York Stock Exchange or its Stock Clearing Corporation, but the agreement by express terms attempts to use the prestige of the Stock Exchange and its Stock Clearing Corporation by providing that all transactions are subject to their rules. To enforce this fantastic agreement against defendant would be tantamount to holding that the "customer's signature card" signed by a layman, in fine print, giving the most universal powers that could be framed for any attorney in fact, could be invoked to preclude defendant from showing the actual state of his account, once any statement, however inaccurate, had been mailed to him and remained accepted by him, without objection for ten days.

Such an agreement, secured in such a manner, violates every principle of public policy, and consequently I hold that the plaintiffs have not made an account stated merely by putting in evidence the account with the agreements attached to it and by putting in evidence the contract that has been referred to. The learned counsel for the plaintiffs in this case quotes an able writer on the law of stock brokers and stock exchanges to the effect that " it is customary for brokers on opening a margin account to require the customer to sign a written agreement defining the conditions on which the account will be carried. * * * A special agreement is therefore essential to give him the rights which the legitimate needs of his business demand, but which, in the absence of the customer's consent, have been denied by law. Special agreements between broker and customer granting these rights are valid and will be enforced in accordance with their terms." The cases quoted in plaintiffs' memorandum, however, do not sustain this position. And whether "special agreements between broker and customer are valid and will be enforced" depends entirely on what those special agreements are. In the case of *Byrne* v. *Weidenfeld* (113 App. Div. 451, 453) the decision turned on the point that in an action to recover the value of securities alleged to have been converted, which were pledged with the defendant, where the defendant answered that the securities had been pledged pursuant to an agreement of joint venture with the consent of the plaintiff, it was error to exclude evidence of such joint venture, etc. It was upon that error that the judgment for the plaintiffs was reversed. The court says (at p. 454): "The exclusion [of the evidence regarding the joint venture] requires a reversal of the judgment." The court says (on p. 452): "The principal question on this appeal is presented by the ruling in exclusion of testimony offered to establish a defense" [that there was a joint venture]. The case of *Smith* v. *Craig* (211 N. Y. 456), quoted to sustain the proposition

that there is no necessity under a written agreement for demanding margin, was one where a plaintiff sued for damages because the broker had sold him out. But in that case the broker had "endeavored to reach the plaintiff at his hotel here [presumably New York] and also in Boston, for instruction * * * but was unable to do so. * * * Plaintiff admits that he received these several statements, but asserts he did not read them except to look at the price for which the cotton was bought or sold." The court merely held that the statements connected with these transactions should have been received in evidence, and it should have been left to the jury to determine whether the plaintiff had agreed with the defendants that in case his margins were running out they could sell his contract without notice to him of the time and place of such sale. *Milliken* v. *Dehon* (27 N. Y. 364) is quoted in plaintiffs' memorandum as authority for the statement that agreements have been upheld where they permitted a private sale in lieu of a public sale, but there the court held that the "consignee" is bound to give notice of a decline and make an actual demand for the margin. Such demand need not be personal, but may be made of the consignor's clerk employed by him as his agent in a particular transaction. The case quoted in plaintiffs' memorandum to the effect that special agreements are not contrary to public policy (*Baker* v. *Drake*, 66 N. Y. 518) merely holds that the parties to a contract may provide therein for any manner of disposition of the pledge to satisfy a claim upon it, *which is not in contravention of the statute, against public policy or fraudulent.* The court (at p. 522 says): "All but two (ALLEN and RAPALLO, JJ.) of the members of the court adhere to the decision in *Markham* v. *Jaudon* (41 N. Y. 235) on three points there maintained: *First.* That the relation of broker and customer, under the ordinary contract for speculative purchase of stocks, is that of pledgee and pledgor. *Second.* That a sale of the stock by the broker, under such a contract, without notice to the customer of the time and place of sale, is a *conversion. Third.* That oral proof of the usage of brokers in such cases is not admissible, to add to or to make part of the contract." I do not think that the reasoning in *Godfrey* v. *Newman* (135 Misc. 764), quoted in plaintiffs' memorandum, which came up in the Municipal Court, is applicable in this case. The case quoted by plaintiffs of *Keller* v. *Halsey* (202 N. Y. 588) to sustain the position that a contract may arise as a result of the brokers sending notices to the client, on which appears a statement setting forth the terms and conditions under which he is transacting the client's business, merely held that it was a question for the jury as to whether the offer of the broker contained in the printed statement had been

accepted by the client so as to constitute a contract. The plaintiff sued brokers for wrongful and unauthorized sale of his stocks. There a judgment for the defendants was directed by the court. Notwithstanding the fact that the defendants had promptly rendered the plaintiff an account of the transaction to which he had not only made no objection, but on the other hand, ratified and confirmed, the court said that this judgment directed by the court in favor of the defendant should be reversed and a new trial granted. The court said the plaintiff had the " legal right to have the jury pass upon his credibility as a witness, and hence the direction of a verdict was an error of law that calls for a new trial." The case of *Thompson* v. *Baily* (220 N. Y. 471) is quoted under the same point by the plaintiff, and although there was a confirmation of the sale on a printed form which stated the execution of the order and noted as follows: " It is further understood that on all marginal business the right is reserved to close transactions at our discretion without further notice when margins are running out," the court said that the jury could find that the later order was given in the belief that the defendants would assume the usual duty of a broker to close the transaction upon notice. Hence the nonsuit was erroneously granted and the court reversed the granting of a nonsuit and ordered a new trial. From the opinion of the court, written by Judge CARDOZO, I quote the following (p. 475): " The defendants say that the plaintiff must be held as a matter of law to have agreed that his cotton might be sold without notice whenever margins were running out. We do not share that view. In the absence of agreement to the contrary, a purchase upon margin charges a broker with the duty to carry the thing purchased for his customer until additional margin has been demanded and refused. *  *  * If some other agreement was made, the defendants have the burden of proving it. They claim to have proved it in two ways: *first*, by the notice which they gave the plaintiff after they filled his order in December, and again by the notice which they gave him after they had bought the cotton in controversy. Whether the effect of these notices was to make out a new contract was a question for the jury. The plaintiff's assent is not so clearly proved as to make a question for the court. The previous transaction, standing by itself, did not prove a course of dealing. It did not prove, as a matter of law, that later transactions would be subject to the terms stated in the notice of confirmation (*Smith* v. *Craig*, 211 N. Y. 456, 464). It left the terms equivocal, for the notice of the reservation of a right to sell at discretion may have been nullified in the plaintiff's mind by the statement of defendants' agent that margin would be asked for if required. The perfunctory warnings

of a printed blank express at the utmost the defendants' general practice. They will readily yield to other and more specific statements of the practice to be followed in dealings with a particular customer. (*Clark* v. *Woodruff*, 83 N. Y. 518, 523.) The lines of the contract are not so sharply defined that the court is free to trace them unaided by a jury. The defendants did not ask the plaintiff in so many words to assent to their reservation of extraordinary powers. They left his assent to be inferred from his receipt of printed forms, which belied the assurance already given by their agent." The quotation by the plaintiff from the case of *Smith* v. *Craig* (211 N. Y. 456) on page 11 of his brief refers to an agreement to close transactions without further notice, and to settle contracts in accordance with the rules and customs of the New York Cotton Exchange, but in that particular case the defendants had endeavored to reach the plaintiff at his hotel, and it will be observed that the agreement referred to "*further notice*," evidently meaning that some notice must be given before the sale. Further on in the opinion (at p. 464) the court says: "The statements with the printed notices thereon, received by the plaintiff after each purchase and sale, *did not conclusively establish a contract between the plaintiff and defendants in their marginal dealings in cotton, but they were evidence to be considered in connection with the testimony of the plaintiff.*" (Italics are writer's.) In the case of *Klapp* v. *Bache* (229 App. Div. 415), quoted by plaintiff, the contract is different from that relied on to bind defendant in this case. The contract in that case, which received the approval of the Appellate Division, afterwards affirmed in 255 New York, 550, without opinion, had no statement at the top in large type that it was a "customer's signature card," and it provided that the broker "*upon failure of the undersigned to comply with any of the provisions thereof, was authorized to sell,*" etc., whereas the "customer's signature card" in this case provided: "That all stocks, securities and commodities from time to time carried in the customer's marginal account or deposited to protect the same are pledged to the brokers as collateral security for the general indebtedness of the customer to the brokers; that such stocks, securities and commodities may be loaned by the brokers or may be pledged by them, either separately or together with other securities, for any amount; that all stocks, securities and commodities carried by the brokers for the customer's account, or supplied by them against sales by the customer, may be sold or purchased at brokers' board, or at public or private sale, without notice, if such sale or purchase be deemed necessary for the broker's protection; that brokers may in said purchases or sales act as principal if they so desire. That in the event of such sales or purchases being insufficient to liquidate the account, the customer

agrees to pay the balance due upon demand." All that the case of *Matter of Toole* (274 Fed. 337) holds is that in the absence of an agreement that they will not do so, stockbrokers have a right to repledge collateral deposited with them to secure advances on margin transactions. The case of *Wicks* v. *Hatch* (62 N. Y. 535) merely held that under an agreement a broker might sell when the margin fell below five per cent. The case of *Manning* v. *Heidelbach* (153 App. Div. 791) simply held that if the notes were not paid the broker had the right to sell the collateral without notice. *Douglas* v. *Carpenter* (17 App. Div. 329) is authority for the proposition that a broker can only borrow on securities up to the amount of the customer's indebtedness. In *Sproul* v. *Sloan* (241 Penn. St. 284) it was held that the fact that a customer suffered no actual damage by the broker's conversion of the stock was immaterial; that the fact that such hypothecation was a common usage can never be shown if it be in contravention of a well-established rule of law.

But there is other evidence in the case which in my opinion entitles plaintiffs to a verdict: *First*, because the customer, after notice of what had occurred, drew considerable sums from his account; *second*, because on one occasion he requested the reinstatement of his account, after notice of everything that had occurred, which request was acceded to by plaintiffs; *third*, he wrote them that he " expected to be able to hand you [the plaintiffs] some cash to put his [defendant's] house in order." Indeed, he put up additional collateral to secure his account after he had been notified of what had transpired. These acts on his part constitute a ratification of what he had been notified of. Certain stocks which had been sold out, as plaintiffs claim, by the authority of the defendant, were repurchased for defendant's account after all the alleged transactions had been completed. The court required strict proof by the plaintiff that the purchases and sales were actually made through the Stock Exchange, which proof plaintiffs furnished in detail. Defendant was unable to convince the court that the plaintiffs had acted in bad faith in the handling of his accounts.

For all these reasons, and regardless of plaintiffs' failure to make out an " account stated " against defendant, judgment is directed for the plaintiffs against the defendant in the sum of $17,951.44, principal, and $2,076.21, interest to January 25, 1932. Defendant's motion to dismiss the complaint is denied. Appropriate exceptions to defendant. Thirty days' stay and sixty days to make a case.

" Customer's Signature Card. C. Clothier Jones & Co. Name, De Ronde, Mr. Frank S. Address, 257 West 29th St., New York,

N. Y. Introduced by Mr. Davidson. Telephone.... Remarks, New York No. 69. I desire to arrange with you to act as brokers for me in the purchase and sale of securities or commodities from time to time for immediate or future deliveries. In view of the fact that I may not at all times when I give orders wish to pay in full for securities or commodities which you may purchase for me, or immediately to deliver certificates for the securities or commodities which you may sell for me, I request the assistance of your credit in making payments for purchases and in the delivery of securities or commodities which I order sold; and to that end I desire to open a credit account with you. It is agreed between you, C. Clothier Jones & Company, Brokers, and myself, the undersigned Customer, that:— (1) All transactions are subject to the rules and customs of the New York Stock Exchange, and its Clearing House, or of the exchange or market where they are executed. (2) That all stocks, securities and commodities from time to time carried in the customer's marginal account or deposited to protect the same are pledged to the brokers as collateral security for the general indebtedness of the customer to the brokers; that such stocks, securities and commodities may be loaned by the brokers or may be pledged by them, either separately or together with other securities, for any amount; that all stocks, securities and commodities carried by the brokers for the customer's account, or supplied by them against sales by the customer, may be sold or purchased at brokers' board, or at public or private sale, without notice, if such sale or purchase be deemed necessary for the broker's protection. That brokers may in said purchases or sales act as principal if they so desire. That in the event of such sales or purchases being insufficient to liquidate the account, the customer agrees to pay the balance due upon demand. (3) That the customer shall be deemed to have accepted and approved of each statement of account current as rendered, unless written notice of objection thereof shall have been given, within ten days after the mailing of said statements to the last official address of the customer on the books of the broker. Confirmations of purchases or sales are accepted as being correct unless notification is given brokers by noon of the following business day, the notification to be mailed on day of transaction to the last official address on the books of the brokers. (4) That this agreement shall be binding in respect to our heirs, executors, administrators and assigns, unless changed in writing signed by both customer and brokers. Date, 3/14/29. Signature, Frank S. De Ronde. Witnessed by W. R. Beecher. Accepted for C. Clothier Jones & Co. by C. C. J."