HANKS *vs.* DRAKE and others.

A purchase of stocks by brokers, as agents for another, with an advance of money by the former on account of the latter, upon condition that the principal shall deposit a margin of ten per cent, and deposit a further margin when required by the agents, is not to be considered a pledge of stocks for the payment of a sum of money advanced thereon, and requiring a notice of the time and place of selling the pledge, to make the sale legal.

Under such an agreement, the agents have a right, upon the principal's failing to deposit a further margin when required so to do, to sell the stock and close the transaction.

This right to sell arises from the previous violation of the contract on the part of the person for whom the stock was purchased, and who, by neglecting to perform on his part, has terminated the obligation of his agents to hold the stock any longer, and left them at liberty to sell the stock for their own protection.

The notice which the law requires in the case of the sale of pledged stock, as security for the payment of a sum of money advanced thereon is not required, in such a case.

But before the owner of the stock can be called upon under such a contract, to deposit any additional margin, the agents should give him notice that his margin is diminished, and that they require a further margin. And a reasonable time to comply should be allowed, before the stock can be sold.

Where agents, within two hours after giving notice to their principal that a further margin was required, no time being specified for compliance, sold the stock and rendered an account of sales; *Held* that the court could not hold, without further evidence, that reasonable time for performance had been given. That to decide that point as matter of law, the facts should appear, by which the court could say the party was able, within the time given, to do the act required, and therefore that the time was reasonable.

Where all the evidence on that subject was that furnished by a former transaction between the same parties, in which, the same notice being given, the agents waited until the next morning, when the deposit was made, and it was satisfactory; *Held* that the principal had a right to suppose that the same course of dealing which had occurred on the former transaction, and was satisfactory to the agents, was expected in the present case; and if the agents required compliance in any shorter time, that they should have given notice accordingly.

If the owner of stocks intends to claim that a sale thereof, made by his agents, was void as being prematurely made, he should dissent at once, and notify the agents of his dissent.

Where the owner of stocks received information of a sale thereof by his agents, in May, and remained silent until September, when he demanded an account of sales, which was sent to him, with a check for the balance due him,

Hanks *v.* Drake.

which he indorsed and collected; *Held* that this amounted to a full *ratification* of the sale; and that it was too late for him afterwards, to seek to set it aside.

THE plaintiff seeks to recover from the defendants damages for selling stock without notice, and without giving sufficient time to furnish the requisite advance for a margin.

There seems to be no dispute about the facts. As stated by the plaintiff, it appears that the defendants had purchased and sold stocks for him at different times ; that when it was desirable to buy or sell stocks he invariably signed a paper requesting them to buy or sell the designated number of shares. That the defendants in the present case purchased for the plaintiff 200 shares of Michigan Southern Railroad Company. That the only understanding he had with the defendants was, that they required a margin upon his operations, of ten per cent, and that when they wanted an additional margin the plaintiff would hand it in. On 20th May the plaintiff received a note from the defendants, saying " Mr. Drake would like to see Mr. Hanks." This was received about noon. The plaintiff went to the office of the defendants, when he was informed by Drake " that the Michigan Southern stock had gone down, and he wanted an additional margin of five per cent, to which the plaintiff replied, " All right ; I will hand it in." No time seems to have been fixed on either side, but about half past two the plaintiff received from the defendants an account of sales of the stock. In September the defendants rendered the plaintiff an account of sales, showing a balance due the plaintiff of $5.90, and inclosing a check for that sum, which the plaintiff received and drew from the bank. This account was furnished at the plaintiff's request. There had been between the parties only one case, previously, in which they had called for a margin, in which case the plaintiff handed it in the next day, and such payment was perfectly satisfactory. On meeting Drake after the sale, on the same day, the plaintiff complained of the treatment as being rough, and the defendant Drake replied, he

Hanks *v.* Drake.

could replace it if the plaintiff wished. In December follow-
ing, the plaintiff consulted his lawyer. On proof of these
facts, the defendants' counsel moved to dismiss the complaint,
which motion was granted, on the ground that the rule as to
pledged stock was not applicable, and that the sale had been
acquiesced in by the plaintiff.

A motion for a new trial, on a case containing exceptions
herein, having been made on the part of the plaintiff, at a
special term, the following opinion was delivered by

CLERKE, J. It is not necessary that I should repeat what
I said orally at the trial. I still think that *Milliken* v. *De-
hon*, (27 *N. Y. Rep.* 364,) is analogous, and is authority in
this case. The only difference is, that the transaction in
the one related to cotton, in the other to stocks ; and that in
the one there was express authority to sell at public or pri-
vate sale, while in the other there was no express direction as
to the method of the sale. One distinguishing feature, how-
ever, in *Milliken* v. *Dehon*, is that the court discarded the
notion, so long prevalent in the courts of this state, that
transactions of this nature were mere pledges, and that there-
fore the sale must be public, with personal notice of the time
and place of the intended sale. Judge Wright says in the
opinion : " That it is doubtful, whether in a legal sense a
pledge of the cotton was made at all, or that strictly the re-
lation of pledgor and pledgee was created. A pledge is defined
to be delivery of goods by a debtor to his creditor to be kept
until the debt be discharged, (*Jones' Bailm.* 117 ; 2 *Kent's
Com.* 577,) that there was a constructive delivery of the cot-
ton before any relation of debtor or creditor existed, and not by
way of bailment, but as a consignment. It was a peculiar
contract between the parties, and is to be construed according
to its own language and circumstances ; and I apprehend
that any apparent difficulty grows out of a perversion of it by
a nice adhesion to rules at best only applicable to relations
of strict and simple pledgor and pledgee." Transactions of

Hanks *v.* Drake.

this nature, in truth, are not equivalent to the delivery of goods by a debtor to his creditor to be kept until the debt be discharged, which as we have seen, is the definition of a pledge ; but they constitute a contract, in which, on the one side, a person undertakes to purchase with his own money a certain article of merchandise on speculation, an article known to be subject to frequent and great fluctuations in the market, and to hold it for the advantage of the other party, who expressly stipulates to keep his margin good, in other words, to protect the holder from the possibility of a loss for reserving the article to serve some future purpose of that other party. On the violation of this essential element of the contract, keeping the margin good, it was an equally essential element of it, following it as a matter of course, that the holder of the article, whose money purchased it in his own name, and remained vested in it, should sell it for the best price which could be procured for it ; otherwise, there would be no possibility of protection for him in holding any article of merchandise on speculation, and especially in holding articles subject to constant and frequent fluctuations, as cotton and shares of stock. Every stock broker and cotton broker would be at the mercy of any desperate speculator who may induce him to purchase a quantity of either, to reserve it in order to serve some future purpose of the speculator, on advancing a small per centage in the first instance. By refusing or neglecting to preserve the margin, according to the agreement, he is plainly in default—the contract ends on the part of the holder ; the latter is absolved from his obligation to hold the article, and he is at liberty to do with it whatever is necessary for his own indemnity. The party in default, as in all other cases, must suffer the consequences. In those sudden and frequent fluctuations it would be ruin to the holder to require him to serve notice on the other party of a public sale on a future day. It would be of the essence of injustice to cast an inevitable loss, in this way, upon the person who could not be entitled to any share of the profits, if any should accrue, instead of on him who alone

would be entitled to them, and whose default alone exposed the holder to loss. There is nothing in the nature and purposes of such contracts to render such a result suitable or necessary.

My mind remains unchanged on the second point. The plaintiff's conduct after the sale clearly amounted to a ratification of it."

Motion for new trial denied, with ten dollars costs.

The plaintiff excepted, and appealed to this court.

*Wm. A. Coursen,* for the plaintiff. I. The defendants could not legally sell the stock without notice to the plaintiff of the time and place of sale. The defendants could not sell at the brokers' board. These principles are (or nearly are) axioms of law in this state. (*Brass* v. *Worth,* 40 *Barb.* 648.) The case relied upon by the defendant (*Milliken* v. *Dehon,* 27 *N. Y. Rep.* 364,) has no analogy whatever to this case. That case was decided upon *a proved special* agreement. In the case now before this court there was no special agreement, and consequently the case cited (and relied upon) had and has no support for the dismissing of the complaint, or for the respondent on this appeal.

II. The ratification alluded to in the motion to dismiss the complaint, and mentioned in the opinion of Mr. Justice CLERKE, was not much relied upon at the trial, and there is certainly no evidence of any ratification that should *take the case from the jury.* The only testimony on that point is that of the plaintiff, and his testimony clearly does not *prove ratification.* He rested under his wrongs for a time, but his remedy against the defendant existed as a legal right of action for six years. His action was brought in less than two years, and he is entitled to the benefits of the law already *in other actions* decided in his favor. (*Morgan* v. *Peabody, at circuit, before Leonard, J.*)

As to accounts stated, they come into consideration only between merchants or mutual dealers, where either party might

render an account. Such accounts were not even remotely thought of, or understood to be in this case by either the plaintiff or the defendant.

*Jas. C. Carter,* for the defendants. I. The cause of action is an alleged wrongful sale of the plaintiff's stock. If the only ground relied upon for showing the sale to be tortious was, as the plaintiff intimated on his cross-examination, that there was an understanding, express or implied, that he should have until the next day to furnish the required margin, there can be no pretense that there was any evidence fit to be submitted to the jury. 1. It was for the plaintiff to *establish* this agreement by *proof;* his vague impression wholly unsupported by any other evidence, that he used the word " to-morrow," amounts to nothing. 2. Even the slight suspicion raised by this testimony is effectually negatived by the fact admitted by the plaintiff, that when the sale was, on the afternoon of the day on which it was made, talked about by the plaintiff and one of the defendants, the former did not even intimate the existence of such an understanding ; his conduct on that occasion was that of a man " eminently dissatisfied," but who still perceived that he had no just ground of complaint ; had he then believed that the understanding between him and the defendant was that he should have until the next day to furnish the margin, he would have burst forth with indignation at such a wanton sacrifice of his rights.

II. If the point made, as to the regularity of the sale, is that it was not *public,* and no notice of the time and place was given, the solution of the question thus raised must be sought through an inquiry into the nature of the transaction and the intent of the parties to it. If, by force of some rule of law, or by implied agreement, the plaintiff was entitled to the benefit of a public sale and to notice thereof, a cause of action was shown, but not otherwise. 1. The plaintiff, indeed, disclaimed on his cross-examination any cause of action on this ground ;

but, although this disclaimer furnishes very significant evidence which will hereafter be considered of the nature of the agreement between him and the defendants, it does not preclude his counsel from asserting and insisting upon this technical ground of action.

III. When property is delivered by a debtor to his creditor as security for the payment of a debt, the transaction is called a *pledge;* the creditor has the right to sell the property and apply the proceeds toward the payment of the debt, but, in general, he cannot exercise this right of sale until he has demanded payment of the debt from the pledgor and given him reasonable notice of the time and place of the sale, and the sale must be at public auction.

IV. But the whole law relating to pledges is *ex contractu,* and based upon the presumed *intent* of the parties to the contract. The foundation of the restrictions above mentioned upon the power of sale is the presumption that the parties could not intend that the pledgor's property should be sold without an opportunity being afforded him of redeeming it, or protecting himself by being present at the sale.

V. It follows from the above, and is well established by authority, that the incidents to the contract of pledge may be shaped according to the pleasure of the parties ; and the restrictions upon the power of sale may be increased, diminished, or altogether dispensed with, as it may suit their necessities or convenience. This would be so, should these restrictions be thought to be better explained upon the notion that they arise out of a principle of equity, rather than from the intent of the parties ; for such an equity may be shaped or waived, as they who are entitled to the benefit of it may choose. " *Quilibet potest renunciare juri pro se introducto.*" and " *Modus et conventio vincunt legem.*" (*Broom's Max.* 538, 546. *Conkling* v. *King,* 10 *N. Y. Rep.* 446. *Brass* v. *Worth,* 40 *Barb.* 648. *Milliken* v. *Dehon,* 27 *N. Y. Rep.* 364. *Genet* v. *Howland,* 45 *Barb.* 560.) 1. The maxims above quoted are not allowed to prevail over

considerations of public policy ; and on this ground a mortgagor's covenant with a mortgagee not to exercise his equitable right of redemption, will not be enforced ; but the analogy has never been applied to the case of a pledgor and pledgee.

VI. In order to show that the restrictions above mentioned upon the power of sale have been in any given case modified or dispensed with, it is not necessary to prove *express words*, either written or verbal, to that effect. Any evidence, competent under ordinary rules, which is calculated to throw light upon the understanding of the parties may be resorted to. A fair conclusion derived by implication is equivalent to one gathered from express language. (*Milliken* v. *Dehon, supra.*) 1. Whenever the intentions of the parties to an oral contract are material, all the facts and circumstances attending the transaction are material to be considered ; indeed, in cases of doubt they are for the most part the only sources from which light can be derived. 2. Especially in such a case are we to consult the object and nature of the transaction itself. (*Milliken* v. *Dehon, supra.*) 3. If the object which the parties to a transaction partaking of the nature of a pledge have in view *could not be achieved except by dispensing with restrictions upon the power of sale*, the conclusion that they intended to dispense with them follows with certainty; otherwise the transaction would not have been entered into. 4. It is to be observed that those cases where the nature of the transaction itself shows that such restrictions were to be dispensed with would be, equally with those of the opposite class, the very ones in which nothing would be said upon the point of the restrictions. Parties are not apt to specially introduce terms and conditions which every one can see at a glance must be implied.

VII. It follows from what has been said that, whether the transaction upon which the present controversy arises be called a pledge, or by some other name, the question whether

it was understood by the parties, that notice of the time and place of sale was to be given before making a sale of the stock is broadly open upon the evidence for argument and decision. Nothing can be clearer than that the expectation and intention of the parties were, and therefore their agreement was, that the plaintiff, if called upon for an additional margin, was to furnish it *immediately*, and that in default of so furnishing it, the defendants should have the right of selling the stock they had purchased at the brokers' board without notice. 1. To understand the intentions of the parties, the tansactions in which they engage must be described. The city of New York furnishes in full perfection all the conditions essential to stock speculation on a vast scale; it is the financial home of nine tenths of all the corporate bodies in the country, contains their transfer offices and is the place where the bulk of their stock is owned or held, and where nearly all the purchases and sales are made; these purchases and sales are nearly all made in one place, and by one body of men, who alone have access to it—namely—the brokers. In the same city, the aggregate daily unemployed balances of business, accumulated in the hands of bankers, banks, insurance companies and other monied institutions amount to the sum of many millions, a large portion of which can be used for no other purpose than speculation; it cannot be borrowed for a definite time, since its custodians cannot tell at what time they may want it; but it may be borrowed at a low rate of interest upon good security upon *call*, that is, to be returned the instant the demand for it is made. Brokers by reason of their employment in the purchase and sale of stocks, become the natural intermediaries through which the benefit, or the curse, as the case may be, of this unemployed capital is procured and distributed among the multitude eager to tempt fortune for her favors; it is furnished to the brokers mainly upon the very stocks they purchase for their customers. Any thing which tends either to stringency in the money market, or to

depress the value of stocks—a commercial failure—a battle—
a rumor from London or Washington—a combination of
operators with the view of affecting the market, all these
causes, sometimes to a greater, and sometimes to a less extent
impel the custodians of capital to call in their loans, and
demand additional securities from the brokers; the calls
must be instantly answered or the broker is ruined; he,
therefore, in turn, is compelled to call upon his customers,
and unless such call is forthwith obeyed, he is driven to
instant resort to his securities and sells them at whatever
price. The magic wand which sets this unemployed capital
in motion to do the work of the speculator is a *margin;* one
thousand dollars placed in the hands of his broker makes
him the master of ten thousand, but he can have it only on
the condition that he stand ready to increase the margin at
the call of the broker; the broker works for a small compen-
sation and must be made secure; the peril and the fruits of
fluctuation in the market belong to the customer; provided
with the margin, the broker will execute the customer's
orders, either to buy or sell for cash or make time contracts;
how much or how often the margin should be increased must
be left to the discretion of the broker; the laws of competi-
tion protect the interests of the customer; it is the interest
of the broker to do his work on as small a margin as possible.
A demand for an exorbitant margin with a view to sacrifice
the interests of the customer would raise a question, not in-
volved in the present case, to be disposed of on its peculiar
merits. 2. It was a transaction of the nature above described
in which the plaintiff engaged. To call it a *pledge* would
be a palpable misnomer; it is more properly designated by
the common phase of " carrying stock," or by the slang one,
" taking a flyer;" to subject it to the general law of pledgor
and pledgee would be to apply to one transaction a system
of rules suited only, and framed only, for another and very
different one. 3. In the case of an ordinary pledge there are
several elements, nearly always present, which give character

to the transaction and distinguish it decisively, so far as respects the questions now involved, from the case at bar. (*a.*) A sale of the property pledged, by the pledgee, is not contemplated ; it is supposed that the pledgor will pay the debt and re-possess himself of the pledge. (*b.*) The exact time of the payment of the debt is not material ; the creditor is deemed secure, and a proportionately less importance is attached to the question of time. (*c.*) Ordinarily, indeed, the debt is not *due* until a considerable period after the making of the pledge. (*d.*) Of course, in such cases the hazard of fluctuation in the value of the pledge does not enter as a material consideration ; or, at all events, is provided against by a liberal margin in the value of the pledge over the debt. 4, On the other hand, in a transaction like the one under consideration, the conditions are very different. (*a.*) No property at all is actually *delivered* in pledge—it is not expected that any will be delivered. It is not expected that the customer is ever to have the *legal title* to the stock purchased ; the expectation is that the broker will buy the stock in his own name, hold it in his own name, use it in any manner he pleases, and finally sell it himself, under the direction of the customer, giving the latter the profits, if any, of the transaction. (*b.*) It is a very distinguishing feature of the transaction that the whole substance of it consists in the buying and selling of the security, supposed to be pledged. (*c.*) But its most characteristic feature is the importance involved in *instantaneous action*. The *motive* for engaging in the business, is the fact that the article to be dealt in is subject to frequent and extreme fluctuations in value. The broker will not furnish the money to his customer for any *definite period of time, even the smallest*. The margin is small, may be overcome by the fluctuations of a few hours, and the security of the broker requires instant attention to his call. (*d.*) The exact market value of the stock is known at each hour of the day, and it cannot well be sold in the proper market at a price above or below the rate for the instant ; consequently

there is not the slightest occasion for notice of time and place of sale, in order to protect the owner. (*e.*) The idea that such an article is to be sold at a public place, such as the Merchants Exchange, where it would be, if anywhere, sacrificed, of course has no place in the understanding of the parties. 5. We think the conclusion is not to be avoided that such a transaction is not properly styled a *pledge*, but that howsoever styled, the ordinary rules requiring notice of the time and place of the sale of the security, and that the sale should be in a public place, are not applicable ; were these rules applicable, the business could not be done as it is done. 6. The transaction cannot be more briefly designated than by defining it to be an employment of a broker by his principal, to furnish the requisite means and conduct a speculation according to the directions of the latter. The agent must obey his instructions, so long as the principal complies with the main condition of the contract on his part, namely : To keep the broker at all times secure. 7. In the case of an ordinary consignment of merchandise for the purpose of sale, where advances have been made upon the strength of the consignment, the consignee must obey his instructions so long as his principal keeps him secure, but a failure in this respect entitles the consignor to sell for the purpose of re-imbursement, and it is not pretended that notice of the time or place of sale is in such a case requisite, or that the sale must be public ; and yet such a transaction has far more of the elements of an ordinary pledge than the one we are considering. (*Parker* v. *Brancker,* 22 *Pick.* 40. *Pothonier* v. *Dawson, Holt's N. P. Rep.* 383.)

VIII. The views above set forth are decisively sustained by the highest authority. The Court of Appeals has held, in a case more nearly resembling a pledge than the present, that whether the ordinary rules of the law of pledge are to be applied, depends altogether upon the intention of the parties ; that a principal mode of ascertaining such intention is to consider the nature of the business engaged in and its require-

ments, and that such operations as the one under discussion furnish conclusive evidence that the technical rules above mentioned were intended to be dispensed with. (*Milliken* v. *Dehon, supra.*) 1. The decision in *Brass* v. *Worth*, (40 *Barb*. 648,) so often relied upon to sustain an opposite doctrine is erroneous in this only, namely : The court assumed that the contract was *silent* upon the subject of how the stock was to be sold, whereas had they interpreted it by the light to be drawn from a *consideration of the business itself*, as the court did in *Milliken* v. *Dehon*, it would have been found to speak a not ambiguous language.

IX. The sale was fully ratified by the plaintiff, and such ratification constitutes a complete defense to the action. 1. Between strangers, if a right of action arises in favor of one by the breach of contract or wrong on the part of another, such right of action cannot in general be extinguished except by payment, release, or accord and satisfaction ; but where the relation of principal and agent subsists the case is different; the ratification of the act of the agent is here equivalent to an original authority. (*Story on Agency*, 239 *to* 260. *Smith* v. *Cologan*, 2 *T. R.* 188, *n. Towle* v. *Stevenson*, 1 *John. Cas.* 110. *Cairnes* v. *Bleecker*, 12 *John.* 301. 2. The dictum to the contrary in *Andrews* v. *Clerke*, (3 *Bosw.* 585,) is not sustained by the cases cited, and is clearly erroneous. 3. Silence on the part of the principal when informed of the facts, is equivalent to express acquiescence. (*Cairnes* v. *Bleecker*, 12 *John.* 301. *Story on Agency, ubi sup.*) The plaintiff was informed of the sale and fully approved of all the facts on the very day of the sale ; he had an interview with one of the defendants thereafter and on the same day, and did not venture to intimate that there had been any violation of his rights ; he remained silent for five months, and then demanded his account, which was furnished him, with a check for the balance due to him ; he received and appropriated this balance, and yet made no claim, and it was not until three months after that, that he ventured to ask even himself whether a lawsuit could not be contrived

Hanks *v.* Drake.

against the defendants, and it does not appear that any complaint was ever made to the defendants until the bringing of the suit. 4. The general ground upon which the rule of ratification rests, is that the agent when acting in good faith, is entitled to know at once whether his conduct is approved or disapproved, otherwise he is in danger of being misled, and loses the opportunity of taking proper precautions to protect himself against the consequences of a claim upon him by his principal; besides this, courts are not inclined to lend their ear to those who, after once having, with full knowledge, acquiesced in the acts of their agents, turn round and make claims upon them after the lapse of time, and the possible destruction of evidence; such conduct does not comport with the mutual candor and confidence which the law requires between principal and agent. 5. The evidence of ratification was overwhelming.

INGRAHAM, J. I concur with the court below, that this transaction is not to be considered a pledge of stocks for the payment of a sum of money advanced thereon, and requiring a notice of the time and place of selling the pledge, to make the sale legal. This was a purchase by the defendants as agents for the plaintiff, with an advance of money by the defendants on the plaintiff's account, upon the condition that the plaintiff should deposit a margin of ten per cent, and deposit a further margin when required by the defendants. Under such an agreement, the defendants had a right, upon the plaintiff's failing to deposit a further margin when required so to do, to sell the stock and close the transaction. This right to sell arises from the previous violation of the contract on the part of the person for whom the stock was purchased, and who, by neglecting to perform on his part, terminated the obligation of the defendants to hold the stock any longer, and left them at liberty to sell the stock for their own protection. The notice which the law requires in the case of the sale of a pledge of stock as security for the pay-

ment of a sum of money advanced thereon is not required, in such a case.

But it is very clear from the terms of the contract, that before the plaintiff could be placed in the wrong, and before he was called upon to deposit any additional margin, the defendants should give him notice that his margin was diminished, and that they required a further margin. It is also clear, and the defendants' counsel admits, that it is equally necessary that a reasonable time to comply should be allowed, before the stock could be sold.

I had occasion to examine a similar question in *Genet* v. *Howland, et al.* (45 *Barb.* 560 ;) but in that case the stock was pledged as security for a note payable on demand, and a notice of intent to sell was held to be necessary. In that case, however, as well as in this, if a notice of any thing to be done was necessary, it was equally necessary that a reasonable time within which to do the act required should be given. Any other rule would be to render any notice useless.

In *Milliken* v. *Dehon,* (27 *N. Y. Rep.* 364,) Wright J. says : " Two things must concur to put the plaintiff in default ; a decline in the market below the margin stipulated in the contract, and a demand that the plaintiff should make good such margin." In that case the demand was to be complied with the next day, and that was held to be sufficient.

In the present case, a notice of not more than two hours was given between the demand of an increase of the margin and the receipt of an account of sales. In all probability, the time between the notice and the sale was much less, because, after the sale was made, the defendants had to return to his office, make the necessary entries, and account of sales, and send the same to the plaintiff. No proof is given when the sale was made. I do not intend to say if the plaintiff had been notified to deposit a further margin within two hours, or even less, that it would not have been sufficient, but under the circumstances of this case, I very much doubt whether we could hold, without further evidence, that rea-

sonable time for performance had been given. There is no proof of usage, and no proof of any facts from which the court can decide whether such reasonable time was allowed. To decide this point as matter of law, the facts should appear by which the court can say the party was able, within the time given, to do the act required, and therefore that the time was reasonable.

All the evidence on this subject is that furnished as to a former transaction between the same parties. In that case the same notice was given, and the defendants waited until the next morning, when the deposit was made, and it was perfectly satisfactory. A precisely similar request was made in this case, and without any notice that the party was required to act in any shorter time, I think the plaintiff had a right to suppose that the same course of dealing which had taken place on the former transaction, and was satisfactory to the defendants, was expected in the present case, and if the defendants required any shorter time, that they would have given notice accordingly.

But if it be conceded that the sale was prematurely made, I am of the opinion that the subsequent acts of the plaintiff amount to a ratification of the defendants' acts, and that he cannot now object to it. For the purpose of this purchase of stock, the defendants were the agents of the plaintiff, and when they sold the stock and rendered the account, it was the duty of the plaintiff to have dissented at once. Had the plaintiff so dissented, the defendants could have replaced the stock without loss. They received information of the sale on the 20th May, and remained silent. In September he demanded an account of sales, which was sent to him, with a check for the balance due him. This check, payable to his own order, was indorsed by him, and the money drawn from the bank, and it was not till some months after, that this action was brought.

If the plaintiff did not intend to assent to this transaction of the defendants, he should at once have notified them

---

Hanks *v.* Drake.

---

thereof. In *Bridenbecker* v. *Lowell,* (32 *Barb.* 9,) Allen, J. says: "The party not having dissented within a reasonable time, an assent to or ratification of the acts will be presumed. When the principals received a letter informing them of what the agent had done, in July, and they were silent until October, and then complained, they were considered to have waived any right of action."

Nor could the plaintiff avail himself of part of the transaction and then repudiate. He accepted payment of the balance on the account as rendered. This ratification as to a part is the ratification of the whole. (*Story on Agency,* 250.)

The plaintiff, however, claims that such acts are not a ratification, unless he had full knowledge of his rights. I do not understand such to be the rule, but that the party must have full knowledge of the facts and circumstances of the transaction. Such facts were all known to the plaintiff. The sale, the price, the balance due, and the circumstances attending the notice, were all within his knowledge, and with full knowledge of the transaction he demands an account of sales, and receives a check for the balance, which he indorses and collects. This amounts to a full ratification of the sale, and it is too late for him now to seek to set it aside.

Judgment should be affirmed, with costs.

LEONARD, J. I think the defendants expected the plaintiff to make the margin good before the meeting of the second board. The plaintiff evidently neglected this, and the defendants were not required to wait longer. Perhaps evidence should have been given of these facts, which the court cannot be supposed to know. At all events, the ratification is clear, and I concur with Judge INGRAHAM, in his conclusion on that question.

J. C. SMITH, J. also concurred.

Judgment affirmed.

[NEW YORK GENERAL TERM, June 3, 1867. *Ingraham, Leonard* and *J. C. Smith,* Justices.]