W. S. PATTERSON *v.* SAMUEL B. KEYS & Co.

A stock and gold broker in Cincinnati received from a customer $4,000, on account of margin on $40,000 of gold to be purchased, together with an order as follows: "Buy for my account and risk $40,000 gold, limit 44½ to-day, upon which I agree to keep ten per cent. margin in cash. If the said margin is not kept good, you are authorized to buy or sell the same at your discretion." The broker purchased the gold through an agent in New York, where it was kept on deposit in bank, and the customer failing to keep up the ten per cent. margin, the broker, upon sufficient notice, sold the gold at a loss:

*Held*, that the customer could not recover back the money deposited as a margin on the ground that the broker had failed to comply with his contract, although he kept the gold, when purchased, in a bank in New York, in his own name and not in the name of the customer, nor in a separate parcel, but subject to his order, in accordance with the well-known usage in that kind of business.

ERROR TO THE SPECIAL TERM.—This is a suit for deposits made by the plaintiff with the defendants, amounting in all to $6,000, with which for commissions and reward to buy gold coin for the plaintiff, which, it is alleged, the defendants neglected and refused to do, and afterward on request to repay the said deposits, they refused. To the petition are attached three exhibits, dated September 17, 19, and November 2, 1867, respectively, for the several sums of $4,000, $1,000, and $1,000, viz:

"CINCINNATI, *September* 17, 1867.

"Received from Mr. W. S. Patterson, four thousand dollars on account of margin for $40,000 gold.

"SAMUEL B. KEYS & Co.
"*Lea.*"

The other exhibits are of like tenor, but of different amounts, as stated.

The defendants answered, admitting the receipt of the deposits, but that they were received under written contracts, in each case, of the following tenor:

"MESSRS. SAMUEL B. KEYS & Co: Buy for my account and risk, forty thousand dollars gold, limit 44½ to-day, upon which I agree to keep ten per cent. margin in cash. If the said margin is not kept good, you are authorized to buy or sell the same at your discretion.

"W. S. PATTERSON.
"CINCINNATI, *September* 17, 1867."

The defendants aver that they accepted the agreement and received the money under it; and that on the respective days when the deposits were made, they bought the several named sums of gold, viz: $40,000 at 44½ premium, $10,000 at 44 premium, and $10,000 at 40¼ premium, according to the contract, and notified the plaintiff thereof; that in all respects they complied with the contract in buying the gold, and rendering the plaintiff monthly accounts, to which he took no exception, but that the plaintiff did not keep his margin good according to the contract, though notified to do so; and finally on sufficient notice, on the 9th of December, 1867, they sold the gold at 36½ per cent. premium, of which sale they notified the plaintiff and rendered him an account thereof, to all of which he took no exception. They deny that any demand of the deposits was made by the plaintiff, and aver as the result of the transactions, that they are indebted to the plaintiff in $179.15 which they are ready to pay and offer to confess judgment to that amount. The statement of

account in detail is attached to the answer, showing that balance to be due to the plaintiff. To this answer the plaintiff replies, denying that the defendants made the several purchases of gold for the plaintiff and in his name, or that they sold said gold for him.

The cause was tried at the February term, 1870. It appeared that Keys & Co., who were gold and stock brokers in Cincinnati, immediately upon the deposits being made and the orders given, telegraphed to their correspondents in New York, Lockwood & Co., who were large dealers in gold, to make the purchases, and they did so; and Lockwood & Co. advised Keys & Co. accordingly, the amounts bought for the plaintiff being noted. Keys & Co. notified the plaintiff of the purchases. It appeared that Lockwood & Co., who did not know the plaintiff in the transaction, actually obtained the gold and held it for Keys & Co., who could have obtained it at any time, as that was the arrangement they had with Lockwood & Co. It did not appear to have been the purpose of the plaintiff to obtain the gold actually; but that he purchased it for speculative purposes merely, putting up the stated ten per cent. margins, to provide against the contingency of its falling below the price at which it was purchased. The gold appears to have been at all times under the control and subject to the order of Keys & Co. who, in fact, held it by way of pledge as security for the money that had been advanced to buy it, though in the hands of Lockwood & Co., and the plaintiff could have obtained it at any time upon paying for it. The specific sums of gold named by the plaintiff in his orders were purchased by Lockwood & Co., and those specific sums were in fact at all times subject to the plaintiff's order. After the purchases were made, gold declined until the margins were about exhausted, and then, upon sufficient notice, it was sold, leaving in the hands of Keys & Co. the admitted sum coming to the plaintiff. It appeared that every step of the whole transaction was understood by the plaintiff, who had some experience, and that

both Lockwood & Co. and Keys & Co. were entirely solvent, and kept on hand constantly large amounts of gold, and could have delivered the gold to the plaintiff at any time by his paying for it the advances and expenses.

On this state of facts, the court at Special Term rendered judgment for the plaintiff for the amount admitted by the defendants to be due to him. A motion for a new trial was made, which was overruled, and a bill of exceptions taken embodying the testimony. The cause is in General Term on error to the judgment of the court below.

*Fox & Bird*, for plaintiff.

*Collins & Herron*, for defendants.

HAGANS, J. There is substantially but one issue made by the pleadings, and one question made on the argument, as follows: Did the defendants in fact make the several purchases of gold for the plaintiff? If so, we understand it to be conceded that the judgment is right. Some objections to the competency of certain evidence admitted by the judge at the trial were made; but these, we understand, are not now insisted upon. Was then the contract executed?

We have been unable to find a case involving similar transactions in which the precise question at bar has been raised; but the cause assimilates itself to cases involving the same principles. The question makes it necessary to notice briefly the nature of the transaction.

It is apparent that the plaintiff knew the method of these transactions, as carried out in this city, and that the gold was not to be bought here. The plaintiff bought no gold of the defendants. The defendants sold no gold to the plaintiff. But both parties understood that the gold was to be bought from a third person in New York, and that the defendants would pay to that person the market value of the gold with the margin of ten per cent. furnished by the plaintiff, and ninety per cent. of their own

money. In the transaction it was not expected by either party that the plaintiff would purchase for the purpose of personally holding the gold, but solely for the chances of gain by a sale when the market price should have risen. For this purpose he agreed to keep the defendants indemnified from all loss upon the gold by keeping in their hands, at all times, ten per cent., in case gold depreciated in the market. What then was, among other things, the result of the agreement? The defendants agreed on their part to buy the gold, to advance the ninety per cent., to hold it subject to plaintiff's order, and if there were a gain, it would be the plaintiff's and not the defendants', to have actually in their name or under their control the gold purchased, and to deliver it upon request to the plaintiff when paid for by him, or to sell upon his order.

The plaintiff agreed to pay the ten per cent. as a margin, to keep that margin good according to the fluctuations of the market, and to take the gold whenever required by the defendants, and pay the difference between the amount paid for it by them and expenses, and his margin. *Horton* v. *Morgan*, 19 N. Y. 170; *Markham* v. *Jaudon*, 41 N. Y. 239.

These two cases are well considered and embody all the law of this case, and settle, to our minds satisfactorily, the principles we have enumerated which lie at the foundation of legitimate dealing in this class of business. The case in 41 N. Y. 239, expressly overrules *Hanks* v. *Drake*, 49 Barb. 186, and *Sterling* v. *Jaudon*, 48 Barb. 459. These transactions have substantially the nature and attributes of pledges. The mere fact that the gold, when purchased, was not manually delivered to the plaintiff and redelivered by him to the defendants, by way of security for advances, does not change the actual character of the transaction. Though the ultimate property of this gold vested in the plaintiff the moment it was purchased, yet by directing these purchases to be made in the mode designated, he must be understood as consenting that the business should be done

in the usual manner—among other things, that the title and possession of the property should remain in the defendants, after being purchased by them in their own name. "No breach of duty," says the court, in 19 N. Y. 170, speaking of shares of stock, "was committed by the defendant in purchasing in his own name. As he was to hold the stock as security for the balance of purchase money which he had advanced, it was proper and entirely consistent with the nature of the transaction, that he should take the title in his own name. If default were made, he would have a right to sell to reimburse himself, and he would be obliged, in that event, to give a title to the purchaser."

But it is urged that this gold should have been kept separate, so that the plaintiff could have had the identical gold in case he paid for it. Besides the fact that the transaction shows that he never intended or expected to have any gold actually, it is enough to say, quoting again the language of the court in 19 N. Y. 170, and substituting "gold" for "shares," that "the plaintiff had no interest in having his shares kept separate from the mass of defendant's stock. One share was precisely equal to every other share. Chancellor Kent said, in a case precisely similar in principle, that it was sufficient if the defendant always had the requisite quantity of shares on hand, and that the law would presume that the shares so on hand from time to time were the shares deposited, because the parties had not reduced them to any more certainty." *Nourse* v. *Prime*, 4 Johns. Ch. 490. See also 7 Johns. Ch. 69.

But it is finally said that the plaintiff knew nothing about Lockwood & Co., who made these purchases in their own name; that they made the purchases on account of Keys & Co.; that Keys & Co. had in fact no control over the gold, and that, therefore, the contract was not executed according to its terms.

The plaintiff knew that the gold was not to be bought

here, but in New York, where it was to be kept for the purposes of the contract.   Both Keys & Co. and Lockwood & Co. are shown to have been at the time abundantly solvent.   In the business of the defendants, it was proved that they always employed a subagent in New York to execute their orders.   This was the usual course of business here, with full knowledge of which the plaintiff is chargeable.   In fact, the purchases made by Lockwood & Co. were purchases made by the defendants; and the evidence showed that Keys & Co. could have had the amount of gold at any time, when the plaintiff upon paying for it might have desired it.

In general, an agent has no right to delegate his authority to a subagent without the assent of his principal. But where, from the nature of the agency, a subagent must necessarily be employed, the assent of the principal is implied.   *The Dorchester and Milton Bank* v. *The New England Bank,* 1 Cush. 177.

Still more, where it is understood, as here, by both parties to be the mode in which the business would or might be transacted.   Story on Agency, sec. 14.

Judgment affirmed.

[Leave to file a petition in error in the Supreme Court refused.—EDS.]