To THE PETITION OE COUNSEL EOR APPELLEE EOR A REHEARING,
Judge Coeer
delivered the eollowing ' response oe the court:'
We have carefully re-examined the grounds upon which the opinion already delivered herein is based, and the authorities relied on by the learned counsel for the appellee to show that the conclusion then reached was erroneous, but have failed to detect any error in the reasoning by which we reached *537 that conclusion, or any conflict between the opinion and the cases cited by counsel. ¥e have, however, concluded that one portion of the opinion was not necessary to a decision of this case, and it has been stricken out.
We said in the opinion that we could not undertake to review all the cases cited by counsel, and point out the distinction between them and this case, and therefore contented ourselves with saying that there was such a distinction.
In the petition counsel have cited only a portion of the oases cited on the hearing, and we deem it due to them, as well as ourselves, to indicate the distinction between those cases and this case. The cases cited are Courcier v. Ritter (4 Wash. 549); Cairnes v. Bleecker (12 Johns. 300); Pickett v. Pearson (17 Vt. 470); and Hanks v. Drake (49 Barb. 202).
The facts in Courcier v. Ritter were these: In October, 1812, Ritter, a merchant of Philadelphia, consigned to Courcier, a merchant of Bordeaux, forty bags of coffee, with instructions to sell immediately on arrival, and forward to him by the same vessel the articles mentioned in the letter of advice. The coffee was not landed until March, 1813, but Courcier had previously written that as soon as it was landed he should use his best endeavors to effect an advantageous sale, and would ship by the return of the vessel the articles ordered. April 28 he again wrote to Ritter as follows: “ I have not been able yet to procure a sale of your coffee, but no exertions will be wanted to avail myself of the first favorable change in the market.” Courcier did not again write to Ritter until May 21, 1815, when he inclosed an account of sales, by which it appeared that the coffee had not sold for enough to reimburse the advance made by the shipment of articles ordered by Ritter, and the suit was brought to recover the balance due thereon. Ritter defended on the ground that his instructions to sell immediately had not been obeyed, and he had been damaged by the holding of the coffee by Courcier; to which Courcier re *538 plied, that by accepting the return cargo (which was procured by an advance made by him, and was not purchased with the proceeds of the outward cargo), and by not promptly objecting to the alleged violation of his orders, of which the letter of April 28 informed him, Ritter had ratified what was done.
In considering this part of the defense, Mr. Justice Washington said: “If the principal, being informed by his agent of the deviation from his orders, makes no objection to his conduct, the law construes his silence into a tacit recognition of the act or omission, against which he will not be permitted afterward to complain. The reason is obvious. He shall not by his silence place his agent in the predicament of losing all the gain which may result from his well-intended disobedience, and yet be exposed to sustain the loss which a mistaken judgment or unforeseen circumstances may produce.”
This principle we recognize fully. “If,” says the learned judge, “the principal, being informed hy his agent of the deviation from his orders, makes no objection to his conduct, the law construes his silence into a tacit recognition,” etc. But suppose he, as the appellee did in this case, fails to notify his principal that he has deviated from his orders, what then does the law imply from the silence of the principal? The same learned judge, in the same case, referring again to the letter of April 28th, says: “ He does not say that he has declined selling on account of the low price of coffee, which would subject his correspondent to a loss, but that the sale of it is impracticable. .....He discloses no breach of orders whatever, if the fact was that no sales could be made; and consequently the defendant’s silence had no known violation of duty to recognize or ratify
Such is precisely the case here. The appellee did not disclose that it had violated its orders, but affirmed that it had not, and “there was no known violation of duty to recognize or ratify.”
*539 Cairnes v. Bleecker is a very long case, but may, for the purposes of this case, be briefly stated as follows: Bleecker received from Cairnes certain goods marked M. Gillett, and was instructed to deliver them to Gillett whenever he deposited with him (Bleecker) property amply sufficient to secure certain drafts drawn by Gillett on Bleecker in favor of Cairnes. In July, after the goods were deposited with Bleecker, he wrote to Cairnes informing him that a certain quantity of ashes had been deposited by Gillett to secure the drafts, and that the goods received for Gillett had been delivered to him. The ashes then held by Bleecker seem to have been understood by both parties not to be “ amply sufficient to secure the drafts,” for in the same letter, informing Cairnes of the delivery of the goods to Gillett, he was notified that Gillett promised more ashes by the next trip of the vessel by which the first lot was shipped. In October Cairnes wrote to inquire of Bleecker what other property, besides the ashes shipped as above stated, Gillett had placed in his hands when he took away the last of the goods. November 1st Bleecker informed Cairnes that Gillett had deposited no property besides the ashes already shipped. On the 12th of the following February Cairnes informed Bleecker by letter that he should look to him for the value of the goods left with him, and which he, in violation of his instructions, had delivered to Gillett without the required deposit of “property amply sufficient to secure the drafts.” That letter was not answered, and August 3d following formal demand was made upon Bleecker for the goods, which he refused to deliver.
In commenting on these facts the court said: “On the 18th of July, 1811, the defendant informed the plaintiff that he had, on the 17th day of that month, delivered to Gillett the last parcel of the goods, and that he (defendant) had received from him twenty-six casks of ashes......The plaintiff rests satisfied until October the 29th, and then, for the first *540 time, asks for information what other property Gillett had placed in his hands when he took the last of the goods.” The duty and instructions of Bleecker were not to deliver the goods to Gillett until he should deposit with him “property amply sufficient to secure the drafts.” Those instructions were violated, and Cairnes was distinctly informed of the fact by letter dated July 18, and with that information he remained silent until October 29. It was held he could not recover.
The statement of facts in Pickett v. Pearson is very long ; but the point decided in the case may be shown by the following statement: The defendant undertook to collect money for the plaintiff who resided in Vermont, from debtors residing in the then territory of "Wisconsin, and was instructed to receive from one of them only gold and silver or bank-notes at par in Vermont; but the defendant disobeyed his orders, and received for a portion of the debt bank-bills not worth more than twenty cents on the dollar, and for the residue he took the note of the debtor. On his return he delivered the bills and note to the plaintiff, who said he did not know the value of the bills, but would see what he could do with them. He received them November 14, and during the ensuing winter learned they were only worth twenty cents on the dollar, and as soon as he ascertained their value, he notified the defendant, and requested him to make up the money as good as the plaintiff had instructed him to receive, but he did not offer to return the bills until after he had sued the defendant, and it does not appear that he ever offered to return the note of hand taken by the defendant for a part of the debt. The defendant at the time of receiving the bank-bills from Chickering, the debtor, took from him a guaranty with surety that the bills were good, and that also was delivered to the plaintiff with the bills, and was retained by him until .after suit was commenced.
In commenting on the facts, the court said: “It seems very plain to us that the plaintiff’s taking the money and *541 guaranty, and keeping them for months, fully exonerated the defendant. The plaintiff received of the defendant all that the defendant received of Chiekering, and all that belonged to him under protest, to be sure, that he would see what could be done with the money. How long a time is to be allowed him to ascertain that fact? It could hardly be pretended that two or three months were necessary to ascertain that fact. It could just as well be done in as many weeks, and very likely in as many days.”
The case was made to turn upon the delay to return the bills after the plaintiff had learned they were not such as he had directed to be received. He knew then that his instructions had been violated, and then, and not until then, or until he might by proper diligence have learned the fact, did he become bound by a ratification.
The case of Hanks v. Drake is thus correctly stated by counsel: “The principal employed the agent to sell stocks for him at a particular time. The agent sold them prematurely, whereby loss was occasioned to the principal. The agent rendered an account to the principal of what he had done. The principal remained silent for four months, then received the proceeds of the sale, and sued the agent for damages for the difference. The court held that' the right of action was lost by ratification, saying: ‘"When they sold the stock and rendered the account, it was the duty of the plaintiff to have dissented at once. Had the plaintiff so dissented, the defendants could have replaced the stock without loss’; and saying further: ‘The plaintiff, however, claims that such acts are not a ratification unless he had full knowledge of his rights. I do not understand such to he the rule; but the party must have full knowledge of the facts and circumstances of the transaction.’ ” Here was four months of silence after the principal knew his instructions had been violated.
*542 It thus appears that between each of the cases cited in the petition (and we assume they are as pertinent as any counsel .have been able to quote) and the case at bar, there is the clear and marked distinction, that in the former the principal knew at the time of the alleged ratification that his instructions had been disobeyed, while in the latter the principal not only did not know that his orders had not been obeyed, but the agent insisted there had been no disobedience.
It is also urged that a considerable time elapsed after the final decision of the suit against the Bank of Louisville before this- suit was brought, and that that delay amounted to a ratification. It is sufficient for this case to say, that no such issue was raised by the pleadings. The simple acceptance of the note and collateral, with alleged knowledge of all -the facts, were the only acts relied on as a ratification.
But we are referred to our opinion in Trigg v. The Second National Bank, as inconsistent with the opinion in this case. The following extract from the opinion in that case will be sufficient to distinguish it from this, and to show that it belongs to the same class with the cases cited by counsel, and which we have just reviewed. We said, “The evidence showed that the note was delivered to appellants in December, and that they then hnetw the facts in regard to the financial condition of the parties to the note, and the value of the col-laterals.” In other words, the appellants in that case knew when they accepted the securities taken by the appellee the value of those securities, and if their agent had deviated from its duty, they then knew the facts.
The petition must be overruled.