JOSEPH KELLY, Respondent, *v*. THE CONNECTICUT MUTUAL LIFE
INSURANCE COMPANY, Appellant.

*Action to reinstate a surrendered policy of life insurance by one who, as executor, has*
*received the amount of a policy issued in exchange therefor — knowledge by the*
*executor of its surrender — notice sufficient to put him upon inquiry.*

A policy of life insurance, which was payable to the son of the assured on the
latter's death, was surrendered by the assured, and another policy was taken
out in its place, payable on the death of the assured to his legal representatives.
On the death of the assured, the son, who was one of his executors, received
from the insurance company and distributed among the creditors of the deceased
the moneys due under the latter policy and executed a release to the insurance
company therefor. After the lapse of nearly six years, without offering to
restore the money thus received, and without charging fraud, but upon the
ground of mistake, the son brought an action to recover of the insurance com-
pany the amount of the original policy which was payable to him.

Upon the trial of this action the evidence showed that he had knowledge, when
he received the money under the policy payable to the legal representatives of
the assured, of the fact that there had been a prior policy payable to himself
which was exchanged therefor; it certainly showed that he had sufficient notice
thereof to make it his duty to inquire before acting.

*Held*, that he could not recover, as his receipt of the money, with knowledge of
the facts, was a ratification of the acts of the assured and estopped him from
demanding that the company pay him the money a second time; and that if he
had only notice sufficient to put him upon inquiry, he was chargeable with the
knowledge which such inquiry would have afforded;

That the court, in passing upon the merits of the case, should consider the delay
which had occurred in bringing the action.

APPEAL by the defendant, The Connecticut Mutual Life Insur-
ance Company, from a judgment of the Supreme Court in favor of
the plaintiff, entered in the office of the clerk of the county of
Albany on the 22d day of October, 1897, upon a verdict of a jury,
and also from an order entered in said clerk's office on the 22d day
of October, 1897, denying the defendant's motion for a new trial
made upon the minutes.

In January, 1863, Shubal Kelly, father of the plaintiff, applied
to the defendant for a policy of insurance, which was issued to him
in the sum of $5,000, to be paid upon his death to the plaintiff.

Shubal Kelly paid the premiums upon that policy until the month
of February, 1874, when the policy was surrendered and another

issued in its place for the same amount, but payable upon the death of Shubal Kelly to his legal representatives.

Shubal Kelly paid the premiums upon this policy also until his death in April, 1890.   He left a will in which his widow, the plaintiff, and a brother-in-law of the plaintiff, one Machesney, were named as executors.   The will was admitted to probate, letters testamentary were issued and all three of such persons qualified as executors.

An inventory of the assets of Shubal Kelly was made May 10, 1890, and sworn to by the plaintiff as one of the executors, and in such inventory was included the policy of insurance before referred to.   The executors made proofs of the death of Shubal Kelly, which they filed with the defendant, and thereafter the defendant paid the amount due upon such policy by a check or draft made payable to the order of such executors, each one being separately named in the check; the same was thereafter indorsed by the plaintiff, and each of the other executors, and the money received thereon; said executors, including the plaintiff, executed a release to the defendant in which they acknowledged the full payment and satisfaction of such policy of insurance.   The money so received was paid out in the due course of administration of such estate, and a decree of the surrogate was entered November 9, 1893, passing and allowing the accounts of said executors, and in such accounts the amount received upon such policy of insurance was accounted for as part of the assets of the estate, and was paid to the creditors of Shubal Kelly. The estate appears to have been insolvent, there not being sufficient assets to pay the creditors in full, leaving nothing for the heirs and next of kin of the deceased.

In February, 1896, the plaintiff commenced this action to recover upon the original policy of insurance taken out by Shubal Kelly for the benefit of the plaintiff.   The defendant in defense, amongst other things, set forth the substitution of one policy for the other, and the change of the beneficial interest, and the payment thereof to the plaintiff and the other executors of Shubal Kelly, deceased, and their release and satisfaction of such policy.

Upon the trial the plaintiff asserted that at the time of receiving the payment, as executor of his father's estate, of the amount due

upon the last policy of insurance, he was in ignorance of the fact that a prior policy had been taken out. The jury rendered a verdict against the defendant, and from the judgment entered upon such verdict, and from an order denying a motion for a new trial, this appeal is taken. Further facts will be stated in the opinion.

*Samuel S. Hatt* for the appellant.

*P. C. Dugan* and *J. Newton Fiero,* for the respondent.

HERRICK, J. :

In determining whether the plaintiff's acts in inventorying the policy of insurance as part of the assets of his father's estate, and in receiving the moneys due upon such policy, and in executing a release thereof to the defendant, and in distributing the proceeds of such policy amongst the creditors of the estate, were done with sufficient knowledge of the facts to preclude him from again applying to the company for the insurance upon his father's life, a brief examination of the evidence in the case will be necessary.

There are some undisputed facts in the case. Shubal Kelly personally paid the premiums for the insurance upon his life; he paid the premiums upon only one policy. The policy originally taken out by him payable to the plaintiff was surrendered to the company in 1874, and a new one issued.

The plaintiff's denial of his knowledge of the existence of the first policy and of his ignorance of any change at the time he received the money from the insurance company is epitomized in this extract from his evidence : " I positively didn't know there was another policy in existence until 1895, until discovered by me and Mr. Downs. Q. That was in '96 ? A. That was '96."

It becomes important then to see whether this statement was true.

It appears from other parts of his testimony that he had some knowledge of the existence of the prior policy, as indicated by this extract from his testimony : " Q. You say that you understood from members of your family that this policy of life insurance, the life insurance of your father, was by a policy made payable to you ? A. Yes, sir ; I understood that from my stepmother and my sister ; we had talked of it in the family ; I could not tell how long I had understood that the insurance was payable to me, quite a num-

ber of years, but I couldn't just tell ; my best recollection is that I should think likely as long as ten or fifteen years."

The plaintiff's co-executor and brother-in-law, Machesney, testified that prior to the death of Shubal Kelly, and while he was sick, the plaintiff had a conversation with him, as follows : "He asked me if I knew his father had a life insurance. I said, 'Yes.' He asked me if I knew it was made payable to him. I said, 'No, I didn't know it.' He said, 'Yes, it was payable to him.' I said, 'The time to discuss that matter was later.'"

Machesney says that shortly after the death of Shubal Kelly the plaintiff, in another conversation, stated that the policy was payable to him.

This would seem to indicate a knowledge upon the part of the plaintiff of the existence at some time of a policy taken out by his father for his benefit.

Another witness sworn upon the trial was a man named Simmons, who testified to a conversation with the plaintiff in the spring or summer of 1891, in which he informed Simmons of the receipt of $5,000 and of his signing for the same, which he said he did not think he should have done ; that there had been a policy which had been changed from the original policy and a new one had been taken out payable to his father; that he had heard that the original policy had been made payable to him, and the other one was made payable to the estate, and said that he knew that there had been a change when he had received the money as executor.

Neither the testimony given by Machesney or Simmons was con- tradicted by the plaintiff upon the trial. There is other evidence in the case that seems to me still more conclusive that the plaintiff was apprised of the true condition of the facts. On the margin of the first page of this last policy is written the following words : " Orig- inal of same No. & Amt., dated January 28, 1863, surrendered for change in benefit."

After the death of Shubal Kelly, and before the making of the inventory, the plaintiff and Machesney went to the office of a lawyer in Albany, and plaintiff asked the lawyer if the insurance policy did not belong to him ; the policy was sent for and brought to the office ; the lawyer read it, read the words on the margin that I have just quoted, and then said, " Joe, this belongs to the estate.

This cuts you off," and stated further that the beneficiary had been changed and that it belonged to the estate and cut him off. The evidence as to what took place at this interview is also uncontradicted.

From all this it would appear that he knew of a prior policy of insurance for his benefit, despite his positive assertion to the contrary.

The plaintiff claims, however, that he was misled by the company. He states that he, in company with his brother-in-law, Mr. Machesney, went to the office of the defendant company to see about the payment of the life insurance policy; he says that his brother-in-law had the policy with him, and states that he then found out it was payable to the legal representatives of his father; that he there saw a Mr. Mallory and an old gentleman, and asked Mr. Mallory and the old gentleman if there was any other policy; that "they said no, nor never had been."

Plaintiff states that he thinks this interview was in June. Mallory positively denies that any such conversation ever took place; Machesney says that he was there with the plaintiff on the ninth day of June; that it was the time they went to get the draft cashed that they had received from the company in payment of the policy, and he testifies that he never heard any such inquiries made by the plaintiff or answered by Mr. Mallory, either then or at any other time.

Assuming that Mallory was an agent of the company, whose declarations would be binding upon it, which is disputed, it will be observed from the plaintiff's statement, and Machesney's corroboration of it, as to the time when the interview took place, that it took place after the consultation over the policy in the lawyer's office, that I have before referred to, when this writing on the margin was read, and the plaintiff was advised that the beneficiary had been changed, and that he was cut off; after the policy had been inventoried as one of the assets of the estate, and also that the policy itself bore upon its face the written evidence and declaration, known to the plaintiff for several weeks, that there had been another policy for the same amount which had been changed for the one then in existence and in possession of the executors, of whom the plaintiff was one.

In the face of this written evidence, being the declaration of the

defendant itself, and in the possession of the plaintiff, it is impossible to say that the plaintiff did not have knowledge that a former policy had been issued upon the life of his father.

The only way to reconcile his statement that "I positively didn't know that there was another policy in existence until 1895, until discovered by me and Mr. Downs," with his other testimony and his knowledge of the written statement on the policy that it was in place of a prior policy, and that the beneficiary had been changed, is that he did not have knowledge of the physical existence at that time of the former policy, because he must have known that, at one time at least, there had been a former policy in existence. Whether it still physically existed, or whether it had been destroyed at the time it was surrendered and the second policy issued, is a matter of no consequence.

The plaintiff's rights would be the same whether the paper upon which the former policy was written was still in existence, or whether it had been destroyed. Those rights depend upon the fact as to whether such a policy had ever been issued, and whether the beneficiary had been legally changed or not.

If, with knowledge of the facts, he received the money and released the company, it is unnecessary to cite authorities to show that he is estopped from asserting any personal right to the insurance upon his father's life, and from asking the company to again pay it to him.

His receipt of the money with knowledge of the facts constitutes a ratification of his father's act in changing the policy.

If, however, it be assumed that he received the money by mistake, it was at the most a mistake as to his legal rights.

A mistake as to one's legal rights, where the party has knowledge of the facts, affords no ground for relief. (*Hanks* v. *Drake*, 49 Barb. 186; overruled upon another point in *Markham* v. *Jaudon*, 41 N. Y. 243.)

A knowledge of the facts alone is sufficient for a ratification; it is not necessary that there should be a knowledge of the legal effect of those facts. (*Hyatt* v. *Clark*, 118 N. Y. 563, 567.)

The facts being known, a mistake as to rights constitutes a mistake of law, and "a mere mistake of law, stripped of all other circumstances, constitutes no ground" for relief. (*Snell* v. *Insurance*

*Company,* 98 U. S. 85, 92 ; *Hunt* v. *Rousmaniere,* 26 id. 1, 15 ; *Bank of U. S.* v. *Daniel,* 37 id. 32, 55.)

Here there is no claim of fraud upon the part of the defendant. It gave written information of the transaction upon the policy itself.

In *Crosier* v. *Acer* (7 Paige, 137) the court said : " If this court can relieve against a mistake in law in any case where the defendant has been guilty of no fraud or unfair practice, which is at least very doubtful, it must be in a case in which the defendant has in reality lost nothing whatever by the mistake, and where the parties can be restored to the same situation substantially, in which they were at the time the mistake happened."

Here there is no pretense that the defendant can be restored to the same position it was in prior to the payment of the policy.

If the plaintiff intended to repudiate the last policy he should have returned what had been received upon it. To retain the money received upon it is incompatible with its repudiation. (*Cobb* v. *Hatfield,* 46 N. Y. 533, 537 ; *Hammond* v. *Pennock,* 61 id. 145 ; *Baird* v. *Mayor,* 96 id. 567, 599.)

It is true that those were cases where the transactions repudiated were fraudulent ones, and here there is no claim of fraud upon the part of the defendant, but the principle is the same. The law will not require less in repudiating a transaction arising out of a mere mistake than it will one arising out of a fraud. If there is justice in requiring the fruits of a transaction tinctured with fraud to be restored or offered to be restored to the guilty person before the transaction can be repudiated, so there is in requiring the restoration or offer thereof to a party who is innocent of any fraud.

The law is not more tender of the fraudulent person than of the innocent and honest.

But if we assume that the plaintiff did not have full knowledge of all the facts, that he did not actually know that the first policy was taken out for his benefit, and that, therefore, he received the money on the last policy in ignorance and by mistake, still I think he had sufficient knowledge to put him upon inquiry, and he is chargeable with the knowledge that such inquiry would have afforded.

The fact in regard to which the mistake is made must not only be unknown, but must be one which could not by reasonable diligence have been ascertained. (*M. E. R. R. Co.* v. *Johnston,* 84 Hun, 83.)

So also it has been held that where money has been paid with full knowledge of all the facts or circumstances upon which it is demanded, or with the means of such knowledge, it cannot be recovered back upon the ground that the party supposed he was bound in law to pay it, when in truth he was not. (*Clark* v. *Dutcher*, 9 Cow. 70, 81.)

So, too, courts have refused to set aside judgments, because of facts afterwards discovered which would have been a defense to the actions in which the judgments were rendered, where such facts " might by the exercise of reasonable diligence, have been ascertained " before the rendition of such judgment. (*Stilwell* v. *Carpenter*, 59 N. Y. 414; *Mayor* v. *Brady*, 115 id. 599.)

So as to a purchaser of real estate, it has been held that, " if the facts within the knowledge of the purchaser are of such a nature as, in reason, to put him upon inquiry and to excite the suspicion of an ordinarily prudent person, and he fails to make some investigation, he will be chargeable with that knowledge which a reasonable inquiry as suggested by the facts would have revealed." (*Anderson* v. *Blood*, 152 N. Y. 285.)

Many other cases might be cited to the same effect. While none of these cases are like the one now before us, yet it seems to me that the principle is applicable, particularly as it appears to be impossible to place the defendant in the same position in which it was before payment was made to the plaintiff as executor, and where, if the plaintiff succeeds, it will result in compelling the defendant to pay double insurance upon one life, upon one policy, and for one premium.

The plaintiff, as we have seen, had for a number of years been informed that his father had taken out a policy of insurance for his benefit; it was common knowledge in the family, talked over with them by him ; upon his father's death it appeared that the policy of insurance was for the benefit of the estate and not for the benefit of the plaintiff, and there was recorded upon its face the fact that the original policy had been surrendered and the beneficiary changed.

These known, conceded facts, assuming that of themselves they are not sufficient to constitute that full knowledge, action upon which will constitute a ratification, are at least abundantly sufficient notice to have put him upon inquiry to find out all the details that could be ascertained. The plaintiff upon the trial seems to have

realized this, and attempted to meet the burden resting upon him by the testimony he gave in regard to his interview with Mallory. I have already discussed the evidence as to that interview, and I have only to add to it that the inquiry that he claims he made of Mallory was in effect answered by the writing upon the margin of the face of the policy then in his possession, and the answer that he claims Mallory gave him was negatived by the same writing.

When, in 1896, he called at the office of the company he seems to have had no difficulty in obtaining access to the books and gaining all the information necessary to enable him to institute this action, evidence in itself that there was no obstacle to his obtaining full information at any time.

Upon the evidence in this case it seems to me, therefore, that he had sufficient knowledge of the facts to be conclusive upon him, and at least sufficient notice to make it his duty under the circumstances to make inquiries if he desired further information before acting.

While it is the rule that a person desiring to repudiate a transaction entered into by mistake should act promptly after discovering the mistake, he should also be required to show reasonable diligence in ascertaining the facts.

Here there has been no endeavor upon the part of the defendant to withhold any of the facts. It placed upon the policy a statement which, to say the least of it, is not only notice, but an invitation to further inquiry. Yet the plaintiff, according to his own account, made no further attempt to investigate the matter until the fall of 1895, and did not commence his action until 1896, nearly six years after he received the money upon the last policy, after the money so received had been distributed among his father's creditors, and after his accounts as executor had been passed upon by the surrogate. This delay, while perhaps not an absolute bar to the plaintiff's claim, is yet a matter that the court cannot help considering in passing upon the merits of this action.

For these reasons the order denying the motion for a new trial should be reversed, and a new trial granted, costs to abide the event.

All concurred.

Judgment and order reversed, and a new trial granted, costs to abide the event.